**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RAUL ZAMORA,

      Defendant-Appellant.

No. 98-2314

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-97-488 JC)**

Marc H. Robert, Marc H. Robert, P.C., Albuquerque, New Mexico, for
Defendant-Appellant.

Louis E. Valencia, Assistant United States Attorney, Albuquerque, New Mexico,
for Plaintiff-Appellee.

Before **EBEL, PORFILIO** and **ANDERSON**, Circuit Judges.

**EBEL**, Circuit Judge.

      Appellant Raul Zamora was convicted of one count of aiding and abetting

an attempted armed robbery in violation of 18 U.S.C. § 2113 (a) and (d).  On

appeal, Zamora argues that the district court erred by (1) admitting 404(b)

evidence of a subsequent robbery, (2) finding that false imprisonment is a crime of violence under U.S.S.G. § 4B1.1, (3) denying his motion to suppress statements to the FBI, and (4) denying his request to instruct the jury on simple bank robbery. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## BACKGROUND

On July 9, 1997, Joseph Gutierrez attempted to rob the Guadalupe Credit Union ("GCU") in Sante Fe, New Mexico. Gutierrez testified at trial that two days prior to the attempted robbery, he and Zamora went from Albuquerque to Sante Fe to check out the GCU and plan how they were going to execute the robbery. During this dry run, Gutierrez and Zamora scoped out the GCU and planned where Zamora would park the getaway car while Gutierrez was inside robbing the GCU. In addition, the two men stopped at a supermarket that had a bank inside and obtained a bank receipt on which they planned to write the demand note.

On July 9, the day of the robbery, Zamora picked up Gutierrez at his house in Albuquerque. After buying and consuming a quantity of drugs, the two men headed to Zamora's Aunt's house, where they obtained some wrapping paper, which was used later to wrap up a box at Gutierrez' house. Once the package was wrapped, Gutierrez instructed Zamora to write out a note that stated there was a bomb in the box and demanded that the clerk put money in a bag. The note

- 2 -

further stated that if the instructions were followed, the bomb would not be activated. After writing the demand note, Gutierrez testified that he and Zamora got into Zamora's car and headed down to Sante Fe. Zamora dropped Gutierrez off in front of the bank and parked the car in the previously selected spot.

Gutierrez, who was carrying the fake bomb, went inside the GCU and approached Joniva Garcia, who was covering the teller line at that time. Gutierrez first asked Ms. Garcia if she had coin wrappers. As Ms. Garcia was providing Gutierrez with the coin wrappers, he handed her the demand note that Zamora had written and placed the fake bomb on the counter. Ms. Garcia testified that she was terrified, because she knew that she did not have access to any money and she did not know what Gutierrez would do when he found out. She proceeded to open several drawers, but there was no money in either of them, and she did not have the key to open any drawers that did contain money. At that point, Gutierrez ran out of the bank. Ms. Garcia then activated the silent alarm and evacuated the building because of the bomb threat.

Meanwhile, Gutierrez found Zamora, who was waiting in the car, and told him to quickly leave town because the robbery attempt had failed. Gutierrez testified that when he told Zamora that he did not get any money in the GCU, Zamora stated "well, we're going to have to do something in Albuquerque." Zamora and Gutierrez then headed to Albuquerque and stopped at a JB's

restaurant. After eating at JB's, Zamora told Gutierrez that he was going to rob the place. Gutierrez then headed out to Zamora's car to wait for Zamora. When Zamora returned to the car, he had a hand full of money with receipts. Zamora and Gutierrez used the money to buy drugs.

On July 11, 1997, Gutierrez was arrested and confessed to his participation in the GCU robbery. Gutierrez further revealed that he had an accomplice in the GCU robbery. A videotape taken during the JB's robbery helped to identify Zamora.

On July 27, 1997, the FBI arrested Zamora. After Zamora was advised of his Miranda rights, he made a statement to the agents. In his initial statement, Zamora claimed to be an innocent accomplice. The agents then interrupted Zamora and told him that his story was inconsistent with the facts as they knew them from their own investigation. Zamora then paused and said "if that's the case, then – then I might want to talk to an attorney." The FBI agents did not consider this to be a request for an attorney and responded to Zamora by telling him that they had gotten everybody else's story. Zamora then went into a narrative as to his involvement in the attempted robbery of the credit union.[1]

_____

[1]Zamora testified at trial that he was unaware that Gutierrez intended to rob the credit union. According to Zamora, Gutierrez asked Zamora to drive him to Sante Fe to a bank where his sister worked in order to ask her for money. Zamora claimed that he was unaware that Gutierrez intended to rob the credit union, until

(continued...)

- 4 -

On August 21, 1997, a federal grand jury returned an indictment charging Zamora with aiding and abetting an attempted armed bank robbery. On October 9, 1997, Zamora filed a motion seeking to suppress the statement he made to the FBI when he was arrested, arguing that the FBI ignored his invocation of the right to counsel. After a hearing, the district court denied the motion. In February, Zamora entered a plea of guilty to a superseding indictment which he ultimately withdrew in May.

On June 4, 1998, a federal grand jury returned a superseding indictment charging Zamora with one count of aiding and abetting an attempted armed robbery, and one count of being an accessory after the fact.

On July 13, 1998, the government filed a motion in limine asking the trial court to admit under Federal Rule of Evidence 404(b) the JB robbery committed by Zamora. The district court granted the motion. Thereafter, Zamora stipulated to the JB robbery in order to minimize the impact on his defense. Because of the

[1](...continued)
he ran out of the GCU and told Zamora to get out of town. Zamora further testified that after eating at the JB's restaurant, it was Gutierrez who suggested they rob the restaurant. Because Gutierrez wanted to use a stun gun, Zamora testified that he interfered and robbed the place himself, in order to prevent anyone from getting hurt. Zamora also claimed, however, that he robbed JB's as a macho reaction to Gutierrez' incompetence in failing to successfully rob the credit union. The testimony by Zamora was contradicted by the admission at trial of his own confession to FBI agents on the day he was arrested, which corroborated the trial testimony of Gutierrez.

stipulation, the court excluded certain government witnesses to the JB robbery and the videotape, but allowed the government to question Gutierrez about the robbery. The court ultimately allowed the admission of the videotape, however, after Zamora testified on his own behalf. The court determined that Zamora opened the door by putting his credibility on the line when he testified that he committed the robbery to be macho and to protect the clerk.

Following the jury trial, Zamora was convicted on count one, aiding and abetting an attempted armed robbery. After finding that false imprisonment, of which Zamora had previously been convicted, is a crime of violence, the court determined that Zamora was a career offender under U.S.S.G. § 4B1.1 and sentenced him accordingly to 262 months incarceration. Zamora now appeals.

## DISCUSSION

### I. 404(b) Evidence

Zamora objects to the admission at trial of evidence that he committed the robbery at JB's restaurant only hours after the failed robbery attempt at the GCU. Zamora claims evidence of the JB's robbery was not properly admissible under Federal Rule of Evidence 404(b), because it was irrelevant and highly prejudicial. The government counters that the evidence was highly relevant to the issues of Zamora's motive, state of mind, plan, knowledge, and lack of mistake or accident. We review the district court's admission of evidence under Rule 404(b) for an

abuse of discretion.  See United States v. Roberts, 185 F.3d 1125, 1141 (10th Cir. 1999).

Federal Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  However, evidence of another crime may be admitted to establish motive, intent, preparation, plan, identity, and absence of mistake or accident.  See Fed. R. Evid. 404(b).

To determine whether Rule 404(b) evidence was properly admitted we look to the four-part test set out by the Supreme Court in Huddleston v.United States, 485 U.S. 681, 691-92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).  This test requires that:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

Roberts, 185 F.3d at 1141 (internal quotations and citation omitted).

The government states that the evidence was offered at trial for the purpose of showing Zamora's motive, state of mind, plan, knowledge, and lack of mistake or accident.  These are clearly proper purposes for the introduction of Rule 404(b) evidence; thus the government has fulfilled the first Huddleston requirement.

The next question is whether the JB's robbery was relevant to proving these proper purposes. Zamora contends the evidence is not relevant because the JB's robbery was subsequent to the charged crime and was not sufficiently similar to the GCU robbery to be probative. We disagree.

This court has previously recognized the probative value of uncharged acts to show motive, intent, and knowledge, whether the acts involved previous conduct or conduct subsequent to the charged offense, as long as the uncharged acts are similar to the charged crime and sufficiently close in time. See United States v. Olivo, 80 F.3d 1466, 1468-69 (10th Cir. 1996); United States v. Bonnett, 877 F.2d 1450, 1461 (10th Cir. 1989). Moreover, although the uncharged crime must be similar to the charged offense, it need not be identical. United States v. Gutierrez, 696 F.2d 753, 755 (10th Cir. 1982). This similarity may be shown through "physical similarity of the acts or through the 'defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses.'" United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997) (quoting United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978)). The more similar the act or state of mind is to the charged crime, the more relevant it becomes. Id.

At trial, Zamora argued that when he drove Gutierrez to the GCU he had no knowledge that Gutierrez intended to rob the credit union. Zamora further

testified that when Gutierrez told him that he had attempted to rob the bank, he was angry because Gutierrez had jeopardized his life, car, and his children. Zamora thus argued to the jury that he had no knowledge, plan, or motive to rob the credit union. We find that the evidence of JB's robbery was properly introduced to show that Zamora did have knowledge, a plan, motive, and intent to rob the credit union.

Although the JB's robbery in Albuquerque and the robbery of the credit union in Sante Fe were not identical, they had significant similarities. In both crimes the intent was to obtain money, apparently to support an addiction to heroin. In the robbery of the credit union, Gutierrez approached the bank teller and attempted to rob her of all the cash present in the bank drawers. In the JB's robbery, Zamora had the cashier open the cash drawer to obtain all the money present in the drawer. Moreover, these two crimes were perpetrated by the same two individuals, namely Zamora and Gutierrez. Further solidifying the link and similarity of states of mind between the two crimes was Zamora's statement upon learning that Gutierrez had botched the credit union robbery that "well, we're going to have to do something in Albuquerque." In light of these facts, we find sufficient physical similarity and similarity in state of mind between the uncharged act and the charged offense.

Furthermore, the closeness in time between the attempted robbery of the credit union and the robbery of JB's restaurant is highly significant. Approximately two hours passed between the attempted robbery of the credit union and the successful robbery of JB's. It is reasonable to infer that within such a short span of time Zamora's state of mind remained the same. We thus conclude that evidence of the JB's robbery was relevant to the issues at trial, and therefore the second Huddleston requirement has been met.

In addition, the district court made the required determination that the probative value of the evidence outweighed the prejudicial effect. Moreover, the court took several steps to minimize any unfair prejudicial effect on Zamora. First, the court excluded the testimony of the JB's cashier. Second, the court prohibited the government from initially playing the JB's robbery videotape until it heard Zamora's testimony. Finally, the court gave defense counsel's requested limiting instruction. The instruction informed the jury it could only consider the evidence for the purpose of drawing "an inference that in doing the acts charged in the indictment, the defendant acted knowingly and intentionally and not because of some mistake, accident, or other innocent reason." Thus, all the Huddleston requirements have been met. We therefore find no abuse of discretion on the part of the district court in admitting the evidence of the JB's robbery.

Zamora further argues that admission of the videotape during the government's rebuttal was highly prejudicial and inflamed the jury. As noted above, the district court did not admit the videotape until after Zamora testified. During direct examination, Zamora testified that he committed the JB's robbery to be macho and to protect the cashier from Gutierrez, who Zamora testified initially wanted to commit the JB's robbery with a stun gun. This testimony directly contradicted that of Gutierrez. The trial court determined that Zamora's testimony put his and Gutierrez' credibility in issue and further determined that the videotape was now relevant to Zamora's state of mind and credibility. We cannot say that this determination was an abuse of discretion. Once Zamora made credibility and his state of mind an issue, the videotape which demonstrated Zamora's state of mind at the time of the JB's robbery became highly relevant.

## II. Career Offender Status

The district court determined Zamora was a career offender under U.S.S.G. § 4B1.1. On appeal, Zamora challenges that determination, arguing that the district court improperly counted his prior false imprisonment felony conviction as a crime of violence. "Whether a defendant was erroneously classified as a career offender is a question of law subject to de novo review." United States v. Mitchell, 113 F.3d 1528, 1532 (10th Cir. 1997).

Under section 4B1.1, a defendant is a career offender if:

- 11 -

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1. Zamora does not dispute that he meets the first two requirements; instead, he argues that his prior false imprisonment conviction was not a crime of violence and that he therefore does not have the two requisite prior felony convictions for the statute. The guidelines define a crime of violence as:

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that–
> (1) has an element the use, attempted use, or threatened use of physical force against the person of another, or
> (2) . . . otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). In determining whether a prior offense qualifies as a crime of violence, we are "limited to examining the statutory elements of the crime," United States v. Bennett, 108 F.3d 1315, 1317 (10th Cir. 1997), but if ambiguity exists under the statute we can look beyond the statute to certain records of the prior proceeding, such as the charging documents, the judgment, any plea thereto, and findings by the court. See id.; United States v. Farnsworth, 92 F.3d 1001, 1008 (10th Cir. 1996).

The New Mexico crime of false imprisonment is defined as follows:

> False imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.

N.M. Stat. Ann. § 30-4-3. The New Mexico courts have defined the restraint constituting false imprisonment as "words, acts, gestures or similar means which result in a reasonable fear of personal difficulty or personal injuries if the victim does not submit." State v. Muise, 707 P.2d 1192, 1198 (N.M. Ct. App. 1985).

Thus, under the statute, false imprisonment involves confining or restraining a person without his or her consent through actions inducing reasonable fear in the victim. This court has previously found certain crimes in which lack of victim consent is an element of the offense to be crimes of violence under statutes similar to U.S.S.G. § 4B1.1. In United States v. Phelps, 17 F.3d 1334 (10th Cir. 1994), we held that kidnapping under the Missouri kidnapping statute constituted a violent felony under 18 U.S.C. § 924(e). See id. at 1342. Section 924(e) of the Armed Career Criminal Act of 1984, defining violent felony, and section 4B1.2, defining crime of violence, use virtually identical language. In Phelps, we found that although the Missouri kidnapping statute does not require proof of physical force as an element of the offense, the crime "nonetheless entails a serious potential risk of physical injury to another based on the requirement that the kidnapping be without that person's consent." Id. (emphasis omitted).

- 13 -

Similarly, in <u>United States v. Reyes-Castro</u>, 13 F.3d 377 (10th Cir. 1993), we held that attempted sexual abuse of a child was a crime of violence under 18 U.S.C. § 16[2], after determining that crimes that involve non-consensual acts on another person involve a substantial risk of physical force. <u>See</u> <u>id.</u> at 379. We further stated that "[i]t does not matter whether physical force is actually used. Our scrutiny ends upon a finding that the risk of violence is present." <u>Id.</u> (internal quotations and citation omitted).

As in <u>Phelps</u> and <u>Reyes-Castro</u>, the crime of false imprisonment involves non-consensual acts on another person. We agree with these cases that there is a substantial risk of physical force being used when a crime involves the non-consensual act of false imprisonment. Although it is possible to theorize situations where physical force would not be used during the commission of the crime, this is not the inquiry. It is not necessary to show actual physical force; instead, it is enough to show that there is a substantial risk of physical injury. The cases from New Mexico discussing the crime of false imprisonment further confirm that there is often a risk of violence associated with this crime. <u>See</u> <u>State v. Ibarra</u>, 864 P.2d 302, 306 (N.M. Ct. App. 1993) (finding evidence that intruders threw the house residents into a closet and, when they escaped, tied

---

[2] 18 U.S.C. § 16 also defines a crime of violence in terms similar to section 4B1.2.

them to a bed, sufficed for a conviction of false imprisonment); State v. Gibson, 828 P.2d 980, 983, 986 (N.M. Ct. App. 1992) (upholding conviction of false imprisonment where defendants pointed gun at officer and then handcuffed and locked him in closet during a prison escape); Muise, 707 P.2d at 1198 (finding evidence sufficient to support false imprisonment conviction where shown that defendant forced a school bus to stop and forced the driver, through fear of violence, to remain confined in bus). Moreover, as noted above, New Mexico courts have recognized that the act of restraining an individual under the crime of false imprisonment involves placing a victim in reasonable fear of violence. Given the substantial risk of violence associated with the crime of false imprisonment, we have no trouble deciding that this crime is a crime of violence for purposes of sentencing the defendant as a career defendant pursuant to U.S.S.G. § 4B1.1.[3]

## III. Motion to Suppress

---

[3] The Sixth Circuit, in United States v. Roberts, 986 F.2d 1026 (6th Cir. 1993), remanded a case to determine whether the crime of unlawful imprisonment involved the "use, attempted use, or threatened use of physical force," thus qualifying it as a crime of violence under U.S.S.G. § 4B1.1. See id. at 1034. That court, however, failed to acknowledge the second part of the definition of a crime of violence under the sentencing guidelines, namely that a crime of violence means any offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2). We therefore do not find this case persuasive as to whether false imprisonment constitutes a crime of violence.

Zamora next argues that after his arrest and while he was being transported by FBI agents to a hearing before a magistrate judge, he clearly invoked his right to counsel, and thus the subsequently procured confession is inadmissible because the investigators failed to honor this request. The district court determined that Zamora's statement was equivocal and thus the agents were not required to stop their questioning. "In reviewing the denial of Defendant's motion to suppress evidence, the trial court's findings of fact are accepted unless clearly erroneous, and the evidence is considered in the light most favorable to the government." United States v. March, 999 F.2d 456, 459 (10th Cir. 1993) (internal quotations and citation omitted). When reviewing an invocation of the right to counsel, specifically, "we review for clear error the district court's factual findings concerning the words a defendant used in invoking the right to counsel. Whether those words actually invoked the right to counsel is a legal determination, reviewed de novo." Id. (internal quotations, citation, and alteration omitted).

At the suppression hearing, the FBI agents testified that after they read Zamora his Miranda warnings, Zamora waived his rights and proceeded to discuss the events of July 9, 1997, claiming he was unaware that Gutierrez intended to rob the GCU. The agents interrupted Zamora and told him that they believed he was lying based on their investigation. At that point, the agent testified that Zamora, seeming like he was thinking out loud, stated, "if that's the case,

- 16 -

then–then I might want to talk to my attorney." Zamora testified at the suppression hearing, and maintains on appeal, that he stated "I guess I need counsel." The record reflects that the district court credited the testimony of the FBI agent. Zamora has presented no evidence to show this finding was clearly erroneous; thus we must determine whether the statement "I might want to talk to an attorney" was an unequivocal invocation of the right to counsel.

In Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court held that a request for counsel must not be "ambiguous or equivocal." Id. at 459. The Court stated that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Id. Furthermore, the Court refused to adopt a rule that would require officers to ask clarifying questions if the defendant's statement was ambiguous. See id. at 461-62.

In Davis, the Court was deciding whether the statement "Maybe I should talk to a lawyer" was an unambiguous request for an attorney. The Court held that this was ambiguous, and thus the officers were not required to cease questioning of the defendant. See id. at 462. Zamora's statement that he "might want to talk to an attorney" is just as ambiguous as the statement by the defendant

in Davis.  Furthermore, the agents testified that when Zamora made the statement he seemed to be thinking aloud.  Under these circumstances, we agree with the district court that Zamora's statement was equivocal.  Therefore, because Zamora did not make an unequivocal request for counsel, the FBI agents were not required to cease questioning.  Thus, the district court properly refused to suppress Zamora's subsequent confession.

**IV. Lesser Included Offense Instruction**

At trial, Zamora proffered a jury instruction which would have instructed the jury that, should they have a reasonable doubt as to whether Zamora or an accomplice committed an armed bank robbery, they could consider the lesser included offense of simple bank robbery.  The district court declined to give the requested instruction.  We review de novo the question of whether an offense for which an instruction was sought actually qualifies as a lesser included offense.  See United States v. Pearson, 203 F.3d 1243, 1270 (10th Cir. 2000).  The district court's determination as to whether there is sufficient evidence to justify the lesser included instruction based on the evidence, however, is reviewed for an abuse of discretion.  See id.

There is no disagreement that simple bank robbery is a lesser included offense of armed bank robbery; therefore, we must only determine whether the district court abused its discretion in determining there was insufficient evidence

to support a simple bank robbery instruction. Zamora was entitled to a lesser included offense instruction if:

> (1) there was a proper request; (2) the lesser included offense includes some but not all of the elements of the offense charged; (3) the elements differentiating the two offenses are in dispute; and (4) a jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense.

United States v. McGuire, 200 F.3d 668, 673 (10th Cir. 1999) (internal quotations and citation omitted). Zamora contends that under the fourth prong a jury could have rationally convicted him of simple bank robbery and acquitted him of armed bank robbery.

In order to prove armed bank robbery, the government was required to show that Zamora or his accomplice ". . . created an apparently dangerous situation, (b) intended to intimidate his victim to a degree greater than the mere use of language, (c) which does, in fact place his victim in reasonable expectation of death or serious bodily injury." United States v. Spedalieri, 910 F.2d 707, 710 (10th Cir. 1990) (internal quotations and citation omitted). Zamora argues that the jury could have rationally concluded that the wrapped box Gutierrez placed in front of the bank teller could not reasonably have been thought to be a dangerous weapon. Based upon the facts presented to the jury, we disagree.

This court has specifically held that "a fake bomb, as a matter of law, may constitute a dangerous weapon, regardless of its actual capabilities, when a victim

confronted with it is placed in reasonable expectation of danger." Spedalieri, 910 F.2d at 709. The evidence presented at trial was undisputed that the bank teller, Ms. Garcia, was fearful for herself and the other employees specifically because Gutierrez had claimed the wrapped box contained a bomb, which he would activate if she did not give him money. Moreover, Ms. Garcia testified that the credit union was cleared because of the bomb threat. A bomb disposal unit arrived at the credit union and x-rayed the package, and no employees were allowed back into the credit union until the bomb unit had cleared the scene. Under these uncontradicted facts, the jury could not have concluded that Gutierrez attempted to rob the bank, but did so without committing an assault or placing Ms. Garcia reasonably in fear of serious bodily injury. Therefore, the jury could not have acquitted Zamora on the greater charge of aiding and abetting an armed bank robbery and convicted him on the lesser included charge. See United States v. Crouthers, 669 F.2d 635, 640 (10th Cir. 1982) (finding no abuse of discretion in failing to give the lesser included offense instruction of simple bank robbery when defendant's defense was that he did not participate in the robbery but was simply a victim, where facts were uncontradicted that accomplice used a gun in perpetrating the bank robbery). We therefore find that the district court did not abuse its discretion in refusing to give the lesser included offense instruction.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED.