# Commonwealth v. Cleveland

*Michael Dugan,* for Commonwealth.
*Orion Rose,* for defendant.

JENKINS, *J.,* July 7, 2010—Enraged that Amber Jackson broke off their romance, Freddie Cleveland tracked Jackson down to her parents' home, broke in through a window, and stabbed her to death. Cleveland incurred serious injuries during his assault that required hospitalization, but he recovered quickly enough to give

a *Mirandized* confession the next day. Unbeknownst to Cleveland, the police refused to allow his attorney to contact him and ignored his attorney's demands not to question him.

The court denied Cleveland's motion to suppress his confession and his motion in limine to exclude photographs of Amber's corpse. A jury found Cleveland guilty of first degree murder and related offenses, and the court imposed a mandatory sentence of life imprisonment for the murder conviction and consecutive sentences for criminal trespass and possession of an instrument of crime.

Cleveland filed a timely notice of direct appeal and a timely statement of matters complained of on appeal. He later submitted a supplemental statement of matters complained of on appeal. Pursuant to Pa.R.A.P. 1925(b)(2), the court will accept the supplemental statement for filing.[1]

---

1. On May 24, 2010, the court ordered Cleveland to file a statement by June 14, 2010. On June 10, 2010, Cleveland filed a timely statement in which he requested leave to file a supplemental statement after receiving the transcript from the second day of suppression hearings. On June 21, 2010, one week after the deadline, Cleveland submitted a supplemental statement clarifying a suppression issue.

Rule 1925(b)(2) authorizes the appellant to file a supplemental statement "upon [his] application . . . and for good cause shown." The court finds that Cleveland's request in his statement for leave to file a supplemental statement constitutes an "application" under Rule 1925(b)(2). Cleveland also showed good cause for filing a supplemental statement, viz., he did not have the transcript from the second day of suppression hearings when he filed his statement, and he needed to review this transcript to determine whether there were any appealable issues.

The court has re-ordered the issues raised on appeal for the sake of convenience.

The court rejects Cleveland's argument that the police violated his Fifth Amendment rights by preventing his attorney from contacting him before his confession. The United States Supreme Court has held that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Moran v. Burbine,* 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1985). Cleveland never requested an attorney during his interrogation and was unaware that an attorney asked to visit him. He was alert and composed during his interrogation and waived his *Miranda* rights knowingly, voluntarily and intelligently.

Cleveland also alleges that he invoked his Fifth Amendment right to counsel during his confession by asking whether he would be allowed to see an attorney when he was out of the hospital. The pertinent decisions establish, however, that Cleveland did not assert his right to counsel merely by indicating his desire to meet with an attorney at some future time.

Finally, Cleveland contends that the jury should not have viewed "gruesome" photographs of Jackson's corpse. Cleveland's attorney expressly waived his objection to all photographs admitted into evidence during trial. Assuming that Cleveland preserved his objection, the photographs were not prejudicial and were relevant to demonstrate Cleveland's homicidal intent. And in any event, the other evidence of guilt was overwhelming.

For these reasons, the court recommends that Cleveland's judgment of sentence be affirmed.

# FACTUAL HISTORY

Cleveland dated Amber Jackson while Amber was in high school, and after her graduation, they lived together at the Drexel Brook Apartments for 2-3 months. N.T., 3/23/10, pp. 214-17. On December 29, 2008, Amber broke off their relationship and moved back to her parents' house in Drexel Hill. N.T., 3/23/10, pp. 170, 174, 216.

One day later, on December 30, 2008, Cleveland returned his keys to the lease administrator at the Drexel Brook Apartments. N.T., 3/24/10, pp. 203-206. When the administrator opined that Cleveland and Amber were too young to live together, Cleveland "became a little bit animated . . . [H]e said, you never know, and he might get back together [with her]." N.T., 3/24/10, p. 205.

Later that afternoon, Amber arrived at her parents' house while conversing with Daniel Bronner on her cell phone. N.T., 3/23/10, pp. 174, 177, 273-75. She informed Bronner that Cleveland was outside the house. N.T., 3/23/10, p. 275. Bronner heard Cleveland beg Amber for a hug and ask "why they couldn't be together, if he was good enough for her." N.T., 3/23/10, pp. 276-77. Concerned for her safety, Amber entered her parents' house and instructed her younger sister, April Jackson, to close the blinds and not to go outside. N.T., 3/23/10, p. 277. Amber said that she saw Cleveland outside. N.T., 3/23/10, p. 277.

Amber and April were the only persons in the house. N.T., 3/23/10, pp. 174, 177. Moments after Amber arrived, April heard glass break on the front door. N.T.,

3/23/10, p. 179. Amber tried to keep the door closed, shouting: "Go away, Fred." N.T., 3/23/10, pp. 179-180. Over the phone, Bronner heard glass breaking and Amber screaming: "Fred, no, don't do this." N.T., 3/23/10, p. 278. A genetic analyst for the Commonwealth identified a blood stain on the front door as matching Cleveland's DNA profile. N.T., 3/25/10, p. 19.

Amber told April to hide and call their father, Wayne Jackson. N.T., 3/23/10, p, 180. April ran to her bedroom closet, called Wayne on her cell phone, and reported that "something was wrong, and . . . Fred was in the house, and . . . he was going to hurt Amber." N.T., 3/23/10, pp. 181, 184; see also, N.T., 3/23/10, pp. 220-21. April heard footsteps running up the back steps and the kind of screaming she associated with scary movies, N.T., 3/23/10, p. 185. The screaming eventually stopped, and she heard footsteps going downstairs. N.T., 3/23/10, pp. 191-92.

Wayne Jackson arrived home nine minutes after April's phone call and saw the center glass broken on the front door. N.T., 3/23/10, pp. 222, 224-25. April approached him and said that she saw somebody's foot in the kitchen. N.T., 3/23/10, p. 239. Wayne ran into the kitchen and saw Cleveland lying there, gasping for air with a dark spot on his shirt and a cut on his throat, N.T., 3/23/10, pp. 240, 260. Officer Cosentino of the Upper Darby Police, who had arrived at the residence shortly after Wayne, saw Cleveland lying in the kitchen and identified the spot on his clothes as blood. N.T., 3/24/10, pp, 11-12, 14. A genetic analyst for the Commonwealth found that the blood stain on Cleveland's shirt matched Amber's DNA profile. N.T., 3/25/10, pp. 13-14.

Wayne ran upstairs in search of Amber and found her lying in a pool of blood in the bathroom. N.T., 3/23/10, pp. 241-42. She had been stabbed with a butcher's knife from the kitchen. N.T., 3/23/10, pp. 246-252. The Commonwealth's medical examiner determined that she died from 26-28 stab wounds and five-10 slash wounds on her head, chest, hands and back.[2] N.T., 3/25/10, pp. 54-63. A stab wound is deeper than it is long on the skin, while a slash wound is a more superficial wound inflicted when the knife is waved in a slashing manner. N.T., 3/25/10, pp. 54-55.

Cleveland was non-responsive and had a life-threatening injury to his chest. N.T., 3/24/10, p. 40. He underwent successful emergency surgery at the University of Pennsylvania Hospital. N.T., 3/24/10, p. 52.

On the evening of December 31, 2008, prior to Cleveland's arraignment, Captain Rhoades of the Upper Darby Police Department interviewed Cleveland at the hospital. N.T., 3/25/10, pp. 114-15, 118. Eighteen hours had passed since Cleveland's surgery. N.T., 3/25/10, p. 141. He received opiate pain relievers two hours before the interview, N.T., 3/25/10, pp. 136-38. Before the interview, an attorney hired by Cleveland's family had faxed one letter to the Upper Darby Police Department demanding that Cleveland not answer any questions or provide any statements and had presented a second letter with the same demand to a police officer outside Cleveland's room. SH, 3/11/10, pp 41-44; SH, 3/15/10, pp. 3-10; exhibits DS-2, DS-3. The police ignored the at-

---

2. The ferocity of this attack moved the prosecutor to comment: "(Cleveland) couldn't have (Amber), so no one else was." N.T., 3/26/10, p. 88.

torney's demands. *Id.* Cleveland was not aware that he had an attorney, because the police refused to allow the attorney to contact him. *Id.*

While Cleveland was lying in bed, Captain Rhoades introduced himself and his partner, Detective Missimer, and advised that they were investigating Amber's murder, N.T., 3/25/10, p. 118. Cleveland responded: "Okay," N.T., 3/25/10, p. 118. Captain Rhoades asked Cleveland what day it was, and Cleveland answered (correctly) that it was his birthday. N.T., 3/25/10, p. 118. The captain asked if Cleveland understood who he and Chuck Missimer were, and Cleveland answered: "Yeah, you're the detectives here about the murder." N.T., 3/25/10, pp. 118-19. The captain stated that he wanted to interview Cleveland about the murder investigation, and Cleveland agreed. N.T., 3/25/10, p. 119.

The captain gave Cleveland *Miranda* warnings and told him that he was under arrest for Amber's murder. Cleveland asked thoughtful and lucid questions about what prison he would be going to, what his bail would be, and whether he would get bail. N.T., 3/25/10, p. 119. The captain recited each question on Upper Darby's *Miranda* form, and Cleveland answered each one in the affirmative, signifying that he understood his rights and agreed to an interview. N.T., 3/25/10, pp. 120-22. Cleveland read the form without asking questions and appeared to understand what Captain Rhoades was saying. N.T., 3/25/10, p. 123. He did not look confused. N.T., 3/25/10, p. 124. Captain Rhoades perceived that Cleveland "was not out of it by any stretch" and saw him sign the appropriate box with handwriting that was "probably neater than mine." NT., 3/25/10, p. 124. Cleveland's

condition did not resemble patients who are "so sedated or so out of it that you can't interview them [because] they don't know what they are saying." N.T., 3/25/10, p. 125.

Captain Rhoades again asked Cleveland his name. He answered: "Frederick Cleveland." N.T., 3/25/10, p. 126. The captain asked his date of birth, and Cleveland replied: "12/31 of 1986." N.T., 3/25/10, p. 127. Cleveland then "gave me his age as . . . 22, that was important to me because he was 21 yesterday." N.T., 3/25/10, p. 127. Cleveland also provided his correct address: 6 West Plumstead Avenue in Lansdowne. N.T., 3/25/10, p. 127.

Captain Rhoades testified that the following conversation took place:

"[Captain Rhoades asked:] 'Fred do you know anything about what happened inside of 455 Foss Avenue last night?' The defendant answered, 'I don't remember anything. I woke up inside an ambulance or a hospital.' He then reviewed the question and the answer, and he put his initials, F.C., by that answer in my presence. I then said to him, 'Fred, anything else you want to add to this statement?' And he answered, 'No.' He then reviewed the question and the answer, and put his initials, F.C., by that answer in my presence. *He then asked would he be allowed to see a lawyer when he got out of the hospital. And I said, 'Well, Freddie, you could see a lawyer whenever you want. There's a* Miranda *form that I showed you. And you don't have to wait until you get out of the hospital.'* And he said, 'No, I understand that, but I don't remember anything.' And I said, 'Well, Fred, you can stand by your statement if you want to. But this isn't the first murder that I've investigated, and it's not

the first murder that [Detective Missimer's] investigated. *But I know this. This is the first murder you've committed.' And without hesitation, he said 'Yes, it is.' He looked me right in the eyes when he said that."* N.T., 3/25/10, pp. 128-29. (emphasis added)

Captain Rhoades added:

"[T]here was no doubt in my mind that, based on 28 years as a cop, and based on 50 years on this planet, he knew what was occurring in that room. I based that on several issues. His date of birth. That it was his birthday. When I asked him what day it was, when I went in there, I expected, Wednesday. He knew it was his birthday. When I asked him his age, he knew he was 22. And, as I said, the day before, he was 21. The doctors weren't there to talk to him. I talked with him . . . If he wasn't able to be interviewed, he would not have been interviewed." N.T., 3/25/10, pp. 138-39.

Captain Rhoades admitted that opiates affect ability to reason and judgment. N.T., 3/25/10, p. 141. Defense counsel asked whether the captain knew that the interview took place "18 hours after they had his chest open, and they were sewing his insides back together . . . ." N.T., 3/25/10, p. 141. The captain answered that he did not know when the operation took place and did not recall seeing chest tubes coming out Cleveland's side. N.T., 3/25/10, pp. 141-42.

Captain Rhoades' trial testimony was both credible and consistent with his testimony during pretrial suppression hearings concerning Cleveland's interview. Captain Rhoades omitted details during trial that he provided during the suppression hearing—*e.g.,* Cleve-

land was "calm [and] aware of his surroundings," SH, 3/11/10, p. 21, "was absolutely paying attention," SH, 3/11/10, p. 21, and "did not appear to be in any pain, discomfort," SH, 3/11/10, p. 26—but these omissions did not impair his credibility or demonstrate that Cleveland's statement was involuntary or procured through illegal means.

## DISCUSSION

### I. *The Court Properly Denied Cleveland's Motion to Suppress his Post-Arrest Statement to Captain Rhoades in the Hospital*

Cleveland argues that the Fifth Amendment required suppression of his post-arrest, pre-arraignment statement to Captain Rhoades, because the police prevented Cleveland's attorney from speaking with him before he met Captain Rhoades.

When reviewing an order denying a motion to suppress evidence, an appellate court is limited to determining whether the evidence of record supports the factual findings, inferences and legal conclusions of the suppression court, *Commonwealth v. Bennett,* 827 A.2d 469, 475 (Pa. Super. 2003). In so doing, the appellate court considers only the evidence of the prosecution along with defense evidence that, fairly read in the context of the entire record, remains uncontradicted. *Commonwealth v. Fitzpatrick,* 446 Pa. Super. 87, 91, 666 A.2d 323, 325 (1995). Questions of credibility and the weight to be accorded to witness testimony are issues within the sound discretion of the trial court. *Id.* If the record supports the fac-

tual findings of the trial court, the appellate court may reverse only for an error of law. *Id.*

In response to a motion to suppress, the Commonwealth bears the burden of production and persuasion to prove that it did not obtain the challenged evidence in violation of the defendant's rights. *Commonwealth v. West,* 834 A.2d 625, 629 (Pa. Super. 2003) (citing *Commonwealth v. Wilmington,* 729 A.2d 1160, 1163 (Pa. Super. 1999), *appeal denied,* 565 Pa. 644, 771 A.2d 1284 (2001)). The Commonwealth must prove by a preponderance of the evidence that the challenged evidence is admissible. *Commonwealth v. Smith,* 784 A.2d 182, 186 (Pa. Super. 2001) (citing *Commonwealth v. James,* 506 Pa. 526, 486 A.2d 376 (1985)).

Although the court did not enter findings of fact and conclusions of law when it denied Cleveland's suppression motion, the analysis in this opinion will allow higher courts to perform appellate review. *Commonwealth v. Reppert,* 814 A.2d 1196, 1200 (Pa. Super. 2002) (notwithstanding absence of pretrial findings of fact and conclusions of law, Superior Court was able to conduct appellate review based on trial court's Rule 1925(a) opinion).

The police did not violate Cleveland's Fifth Amendment rights by preventing his attorney from speaking with him before his interrogation, since he knowingly, voluntarily and intelligently waived his *Miranda* rights and was unaware that an attorney was attempting to contact him. *Moran, supra,* is squarely on point. There, the suspect confessed to murdering a young woman after receiving *Miranda* warnings and executing a series of written waivers. At no point during the course of the

interrogation, which occurred prior to arraignment, did he request an attorney. While he was in police custody, his sister attempted to retain a lawyer to represent him. The attorney telephoned the police station and received assurances that the suspect would not be questioned further until the next day. In fact, the interrogation session that yielded the inculpatory statements began later that evening. The United States Supreme Court held that the police did not violate the suspect's Fifth Amendment rights. Where a suspect waives his *Miranda* rights prior to arraignment, the court observed, failure by the police to inform the suspect that an attorney tried to contact him does not invalidate an otherwise proper waiver. The court reasoned that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.,* 475 U.S. at 422. The court continued:

"We have never read the constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights ... Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-23.

The court emphasized that "the level of the police's culpability in failing to inform respondent of the telephone call has [no] bearing on the validity of the waivers ... [T]he state of mind of the police is irrelevant to the

question of the intelligence and voluntariness of [the suspect's] election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident." *Id.* at 423.

Nor did the failure to inform the suspect of his attorney's telephone call invalidate the waiver:

"Granting that the 'deliberate or reckless' withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because [the suspect's] voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waivers were valid. *Id.* at 423-24.[3]

As in *Moran,* Cleveland did not know that an attorney was attempting to contact him, since Upper Darby police refused to allow the attorney to visit Cleveland and disregarded the attorney's letters demanding that Cleveland not provide any statement. Under *Moran,* this behavior, while arguably unethical, does not violate the Fifth Amendment. The fact that Cleveland's family hired counsel did not trigger Cleveland's Fifth Amendment rights, since this right is personal and cannot be invoked by another party. *Commonwealth v. Hall,* 549 Pa. 269, 285, 701 A.2d 190, 198 (1997) (citing *Commonwealth*

---

3. The court also rejected the suspect's Sixth Amendment and due process arguments.

*v. Lark,* 505 Pa. 126, 133, 477 A.2d 857, 861 (1984); *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)) (while police interviewed defendant, attorney called the police at request of defendant's mother, but police represented that they were not questioning defendant and would not allow attorney to speak with defendant; court refused to find Fifth or Sixth Amendment violations, since defendant himself never asked for an attorney, and only defendant controls authority to exercise his rights); see also, *Commonwealth v. Edmiston,* 535 Pa. 210, 227 n.1, 634 A.2d 1078, 1086 n.1 (1993) (defendant's mother alleged that police refused to permit her to contact counsel while she was at police barracks; following *Moran,* [v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)], court held that "events occurring outside of the presence of a suspect and entirely u own to him can have no bearing on the capacity to comprehend and knowingly relinquish his constitutional rights . . . any right to the presence of legal counsel belonged solely to appellant and may not be assumed by third parties. He was informed that his mother was present and stated he did not want to see her. Any actions by her outside of the appellant's presence have no bearing upon an analysis relating to a waiver of his rights").[4]

_____

4. For similar decisions from other jurisdictions, see *Matney v. Armontrout,* 956 F.2d 824 (8th Cir.1992) (*Moran* applies though defendant had earlier personally retained counsel, where defendant did not know attorney had been turned away; such a defendant "exhibits an even greater understanding of the nature of his legal rights"); *Bell v. State,* 280 Ga. 562, 629 S.E.2d 213 (2006) (where defendant's mother hired lawyer for defendant and police refused to let lawyer see defendant, all unknown to defendant, defendant's subsequent *Miranda* waiver valid); *State v. Williams,* 99 Ohio St. 3d 439, 793 N.E.2d 446, 459 (2003); *State v. Hyatt,* 355 N.C. 642, 566 S.E.2d 61, 71-72

Furthermore, like the suspect in *Moran,* Cleveland knowingly, voluntarily and intelligently waived his *Miranda* rights before giving his statement. Cleveland was composed, alert, thoughtful and not in visible pain despite undergoing major surgery 18 hours earlier and receiving pain medication two hours before Captain Rhoades arrived. He understood everything Captain Rhoades was saying; he was oriented as to time, place and circumstances; he spoke in a manner that demonstrated his lucidity; he readily agreed to participate in an interview, and Captain Rhoades and Detective Missimer did not threaten him with repercussions if he refused to give a statement. See *Commonwealth v. Bracey,* 541 Pa. 322, 334, 662 A.2d 1062, 1068 (1995) (defendant did not establish that his physically weakened condition rendered his confession involuntary; although defendant had suffered severe burns, he was made as comfortable as possible during interview, he was stable, alert, coherent and

---

(2002) (under *Moran,* police were not required to inform defendant during interrogation that his father had retained counsel on his behalf and that counsel was present at police station, even though defendant had asked to speak to his father); *Ajabu v. State,* 693 N.E.2d 921 (Ind. 1998) (where father without son's knowledge retained attorney who called the jail and asked that son not be questioned, but son not told, *Moran* applies); *State v. Ringo,* 30 S.W.3d 811 (Mo. 2000) (*Moran* applies where defendant's sister contacted attorney and asked him to go to police station to check on defendant; when attorney did, police refused to let him see defendant; no suggestion defendant aware of sister's efforts); *Jackson v. Commonwealth,* 255 Va. 625, 499 S.E.2d 538 (1998), (under *Moran,* fact, unknown to defendant, that police delayed in allowing mother to see him has no bearing on waiver of rights); *State v. Earls,* 116 Wash.2d 364, 805 P.2d 211 (1991) (*Moran* applies where defendant knew his ex-wife was trying to retain counsel for him, but did not know police failed to deliver message to call him from attorney she contacted).

cooperative, and he expressly understood and waived his *Miranda* rights; record was devoid of any evidence that defendant's powers of resistance were weakened or that his self-determination was undermined); see also, *United States v. Cristobal,* 293 F.3d 134, 141 (4th Cir. 2002) (defendant's waiver of *Miranda* rights while hospitalized prior to police interrogation was voluntary, even though he had received painkillers and narcotics prior to waiver; defendant never requested not to be interviewed, no officer harmed or threatened defendant if he did not waive his rights, officer who conducted interrogation checked with nurse to make certain defendant was alert before interrogation, and officer fully advised defendant of the nature of investigation, read defendant his *Miranda* rights, and made sure that defendant was willing participant in interview); *United States v. Guay,* 108 F.3d 545 (4th Cir. 1997) (citing *United States v. George,* 987 F.2d 1428 (9th Cir. 1993) ("a defendant may voluntarily waive his rights even when in the hospital, on medication, or in pain"); *Escobar v. State,* 699 So.2d 988 (Fla. 1997) (although defendant was earlier wounded in shoot-out with police, at time of waiver, hospital records showed his vital signs stable and that he was alert and active and oriented as to time, place and circumstances).

Thus, even though the police prevented Cleveland's attorney from speaking with him and disregarded the attorney's demands not to interview him, Cleveland's statement to Captain Rhoades was not subject to suppression under the Fifth Amendment.[5]

---

5. Cleveland does not argue that his Sixth Amendment rights were violated, but it would not have helped him to raise this defense. He had not been arraigned at the time of his interrogation, so his Sixth Amendment rights had not yet attached.

Cleveland also contends that he invoked his right to counsel during the interrogation by asking whether he could see an attorney when he left the hospital. While Pennsylvania courts have not addressed this scenario, other courts have found similar requests too equivocal to constitute invocation of the right to counsel under the Fifth Amendment.

Courts apply an objective standard in determining whether the defendant has invoked the right to counsel. *Davis v. United States,* 512 U.S. 452, 458-59, 114 S.Ct, 2350, 129 L.Ed.2d 362 (1994) (citing *Connecticut v. Barrett,* 479 U.S. 523, 529, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987)). The defendant must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. It is not enough that the defendant might be invoking the right to counsel; he must do so unambiguously. *Id.* When

---

Nor did Cleveland argue that the police violated his rights under the Pennsylvania Constitution. If he had, *Commonwealth v. Arroyo,* 555 Pa. 125, 723 A.2d 162 (1999), probably would have barred relief. In *Arroyo,* during police questioning, an attorney telephoned the police barracks and requested to speak with the defendant to determine if he desired counsel. The police refused the attorney's request and did not inform the defendant that the attorney had attempted to contact him. The *Arroyo* court observed that *Moran* involved a "strikingly similar" scenario, *id., 555* Pa. at 132, 723 A.2d at 165, and noted that the defendant accepted *Moran* as foreclosing any federal constitutional claims. *Id.* at 133, 723 A.2d at 166. *Arroyo* went on to hold that the police did not violate the defendant's right to counsel and to due process under Pennsylvania Constitution, and that the defendant's right against self-incrimination was no greater under the Pennsylvania Constitution than under the Fifth Amendment. *Id.* at 135, 723 A.2d at 166-67 (citing *Commonwealth v. Morley,* 545 Pa. 420, 429, 681 A.2d 1254, 1258 (1996); *Commonwealth v. Swinehart,* 541 Pa. 500, 512-18, 664 A.2d 957, 962-965 (1995)).

he makes an ambiguous statement, police officers need not cease an interrogation, *id.* at 459-60, 114 S.Ct. 2350 (citation omitted), or ask clarifying questions. *Id.* at 461-62. Thus, the defendant's statement in *Davis,* "maybe I should talk to a lawyer," was too ambiguous to constitute a request for counsel under the Fifth endment. *Id.* at 462.

Following *Davis,* courts have found a variety of statements too ambiguous to constitute invocation of the right to counsel. See *United States v. Peters,* 435 F.3d 746, 751 (7th Cir. 2006) (defendant did not unambiguously invoke his right to counsel when, after a significant time period elapsed following reading of *Miranda* warnings, during which he waived right to attorney and interrogation began, he stated "I'd like to get to that part now," in reference to officer's earlier statement, at time that warnings were read, that defendant would be taken to pretrial services to determine whether he was financially eligible for appointed counsel); *United States v. Banks,* 282 F3d 699, 706 (9th Cir. 2002) (defendant's assertion during interrogation "that he wanted to consult with a lawyer about the possibility of making a 'deal' in exchange for divulging information about his suppliers" was not an invocation of right to counsel concerning questions on other matters); *United States v. Brown,* 287 F.3d 965, 972-73 (10th Cir. 2002) (suspect's contradictory answers on *Miranda* waiver form that he would answer questions without an attorney and that he wanted to talk to a lawyer too ambiguous to constitute invocation of right to counsel); *Mitchell v. Gibson,* 262 F.3d 1036, 1056 (10th Cir. 2001) (defendant's inquiry to police whether he needed an attorney not unequivocal request for counsel under *Davis*); *United States v. Zamora,* 222 F.3d 756, 766 (10th Cir. 2000) ("I might want to talk to

an attorney" ambiguous); *Diaz v. Senkowski,* 76 F.3d 61, 63-64 (2d Cir. 1996) ("Do you think I need a lawyer?" ambiguous); *Flamer v. Delaware,* 68 F3d 710, 725 (3d Cir. 1995) (defendant's request to call someone about possible representation ambiguous); *Commonwealth v. Jones,* 439 Mass. 249, 786 N.E.2d 1197, 1206 (2003) ("I'm going to need a lawyer sometime" not sufficient); *State v. McCray,* 332 S.C. 536, 506 S.E.2d 301, 306 (1998) (post-waiver statement by defendant he would retain lawyer at some future date not invocation of right to counsel); compare *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct 2093, 100 L.Ed.2d 704 (1988) (accused invoked right to counsel where he stated he wanted a lawyer before answering any police questions).

Cleveland did not unambiguously state that he wanted to speak to an attorney before talking with Captain Rhoades. Nor did he demand that an attorney be present during the interview. He merely asked whether he could speak with an attorney *after* the interview—specifically, after he got out of the hospital. This did not constitute an unequivocal invocation of his right to counsel during the interview, so it did not require Captain Rhoades to stop the interview or ask Cleveland to clarify his request. The court properly denied Cleveland's motion to suppress.

## II. *Cleveland Waived his Objection to Photographs of the Crime Scene; in any Event, the Photographs Were Admissible*

Cleveland insists that the court abused its discretion by permitting the jury to view "unnecessary, inflammatory, prejudicial . . . [and] gruesome" photographs of Amber Jackson.

Cleveland waived his objection to all photographs introduced during trial. Prior to trial, defense counsel objected to only three of the dozen or so photographs that the Commonwealth intended to introduce. N.T., 3/18/10, pp. 6-8. Counsel withdrew his objection to the first photograph when the Commonwealth agreed to block out Amber's eyes and nose. N.T., 3/18/10, pp. 11-13. The court sustained counsel's objection to the second photograph, N.T., 3/18/10, pp. 13-15, so the Commonwealth did not introduce it during trial. The court asked the Commonwealth to change the third photograph from color to black-and-white and to black out Amber's eyes. N.T., 3/18/10, pp. 16-18.

During trial, defense counsel stated that he had no objection to the photographs introduced into evidence. N.T., 3/23/10, pp. 242-44 ("no objection" to Commonwealth exhibits 11A-11E); N.T., 3/24/10, pp. 16-17 (no objection raised to exhibit 11A); N.T., 3/25/10, pp. 64-67 (counsel stated that he had no objection to Commonwealth exhibits 54A-54F and 55). In particular, counsel did not object to exhibit 55, the photograph that the court directed the Commonwealth to change to black-and-white with blacked-out eyes. N.T., 3/25/10, p. 66. Thus, Cleveland has not preserved any objection to the photographs for appeal. *Commonwealth v. Solana,* 588 Pa. 716, 734-35, 906 A.2d 1180, 1191 (2006) (in capital appeal, since photographs from autopsy and actual shirt and shorts worn by murder victim were admitted without objection, defendant waived objections to admission of this evidence); *Commonwealth v. Bruce,* 916 A.2d 657, 670 (Pa. Super. 2007) (defendant waived objection to admission of photographs by stating "no objection" when Commonwealth moved for their admission).

Even if Cleveland preserved his objection to the photographs, there was no error. Pennsylvania appellate courts review the admission of photographs for abuse of discretion. *Commonwealth v. Malloy,* 579 Pa. 425, 438, 856 A.2d 767, 775 (2004). Here, the photographs were relevant because they corroborated eyewitness testimony about the location and circumstances of the murder. They also correlated the medical examiner's detailed testimony about the location of Amber's wounds. Finally, and perhaps most importantly, they demonstrated Cleveland's specific intent to commit first-degree murder.

Nor were the photographs prejudicial. Our Supreme Court has stated:

"[P]ictures of the victim are not per se inadmissible. In relation to admissibility of these photographs, we have promulgated the following test:

"[A] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible.

"'The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error.' *[Commonwealth v.] Rush,* [538 Pa. 104, 646 A.2d 557,] 560 [(1994)]. As we also explained in *Rush:*

"A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt. Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs.

"*[Commonwealth v. ] Robinson,* [581 Pa. 154, 864 A.2d 460,] 501-502. (citations omitted) Neither graphic testimony nor the pictures' gruesome nature precludes admissibility of photographs of a homicide scene. See *e.g., Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203, 217 (1997) ('While the presence of blood on the victim depicted in the photographs is unpleasant, it is not in and of itself inflammatory.'); *Rush,* at 559-60 (pictures of victim's body at crime scene were admissible despite medical examiner's testimony); *Commonwealth v. Gorby,* 527 Pa. 98, 588 A.2d 902, 908 (1991) (no abuse of discretion in allowing photographs 'which depicted a large gaping gash on the victim's neck as well as 13 other knife wounds located on the victim's hands, arms, back, and chest'); *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1373-74 (1991) (no abuse of discretion in allowing photographs of victim's slashed throat,

122

open eye, and other head injuries as evidence of specific intent to kill)." *Commonwealth v. Wright,* 599 Pa. 270, 304, 961 A.2d 119, 138-39 (2008); see also, *Commonwealth v. Tharp,* 574 Pa. 202, 224, 830 A.2d 519, 531-32 (2003), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2161, 158 L.Ed.2d 736 (2004) (introduction of photographs was proper even though testimonial evidence to demonstrate injuries was available); *Commonwealth v. Begley,* 566 Pa. 239, 268, 780 A.2d 605, 622-23 (2001) ("even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs") (quoting *Commonwealth v. Jacobs,* 536 Pa. 402, 407, 639 A.2d 786, 789 (1994)).

In *Wright,* the Supreme Court rejected the defendant's argument that photographs of the decedent's body were inflammatory, had no overwhelming evidentiary value, and were cumulative of other evidence:

"[Appellant] fails to specify how they are inflammatory, why they lack evidentiary value, or what other evidence they duplicate. He merely restates the standards, in hopes this court will formulate arguments on his behalf . . . .

"The trial court explained the photographs were not cumulative, but rather illustrated the area of the shooting, position of the body, location of the shell casings, and corroborated Mrs. Mowery's testimony, which appellant contested. It admitted the photographs because 'they were neither gruesome nor necessarily explicit in their portrayal of the body'. . . Having reviewed the photographs at issue, we agree the pictures are not unnecessarily gruesome and only show limited amounts of dried blood. We conclude the trial court did not abuse its

discretion in determining the photographs were relevant and not inflammatory." *Id.,* 599 Pa. at 305, 961 A.2d at 139.

Similarly, in *Malloy,* the defendant "assert[ed] that the introduction of the two autopsy photographs was prejudicial [but did] not offer any explanation as to why that is so." *Id.,* 856 A.2d at 777. Thus, the trial court properly held that "admission of the photographs was proper because the stippling effect and the effect of the shooting at close-range, which was relevant to the charge of first-degree murder, could not be adequately explained without the photographs." *Id.*

Furthermore, in *Commonwealth v. Edwards,* 521 Pa. 134, 151, 555 A.2d 818, 827 (1989), the trial court admitted 13 photographs of the victim's body which depicted her beaten face, the strangulation area of her neck, wounds on her hands and fingers, bite marks on her legs, and explicit photographs of her chest and abdomen related to the sexual nature of the attack. *Id.* The Supreme Court concluded that "[t]he photographs admitted were not inflammatory and were relevant in aiding the jury to understand the events of the crime charged." *Id.*

As in the foregoing decisions, the rulings in this case concerning the photographs did not harm Cleveland. The court reviewed several photographs prior to trial and excluded one photograph that might have inflamed the jury due to the amount of blood around Amber's head. Two other photographs were blacked out in part and/or changed from color to black-and-white to prevent prejudice. The remaining photographs presented no danger of prejudice.

Even if the photographs admitted into evidence were inflammatory, their admission was harmless error, for

the other evidence of Cleveland's guilt was overwhelming. Amber had broken off her relationship with Cleveland one day before the murder. Cleveland was upset that the relationship ended, as shown by his conversation with the manager of the apartment where he and Amber resided and by his conversation with Amber outside her parents' house shortly before the attack. Two witnesses, Brannon and April Jackson, heard Cleveland smash the front door window and break into Amber's parents' house as Amber implored Cleveland to stay out. A blood stain on the front door matched Cleveland's DNA profile. April heard Cleveland pursue Amber upstairs, where April heard screaming that sounded like a horror movie. Cleveland attacked Amber ferociously with a butcher's knife that he grabbed from the first floor kitchen. Amber's father and a police officer found Cleveland lying in the kitchen minutes after he staggered downstairs from the bathroom where Amber lay dead. Given this evidence, it is virtually inconceivable that exclusion of the photographs would have resulted in a different verdict.

## CONCLUSION

For the foregoing reasons, Cleveland's judgment of sentence should be affirmed.