**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 11, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JUSTIN DALE LITTLE,

    Defendant - Appellant.

No. 23-5077

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:21-CR-00162-MWM-1)**

_____

Cristen C. Thayer, Assistant Federal Public Defender (Rene L. Valladares, Federal Public Defender, and Rohit S. Rajan, Assistant Federal Public Defender, with her on the briefs), Las Vegas, Nevada, for Defendant-Appellant Justin Dale Little.

Steven Briden, Assistant United States Attorney (Clinton J. Johnson, United States Attorney, and Elizabeth M. Dick, Assistant United States Attorney, on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee United States of America.

_____

Before **TYMKOVICH**, **EBEL**, and **EID**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

This case presents an issue generated by the sea change in criminal

investigation and prosecution that was initiated by the Supreme Court's decision in

McGirt v. Oklahoma, 591 U.S. 894 (2020).  Defendant Justin Little was investigated and arrested by state police in Oklahoma in April 2018 after his wife's boyfriend was shot and killed on the Muscogee Creek Reservation.  Under the Supreme Court's holding two years later in McGirt that the Creek Reservation had not been disestablished, state police lacked jurisdiction over Little's offense when they investigated him.  No one disputes the fact that the state of Oklahoma lacked jurisdiction over this offense.  Little was convicted of first-degree murder in federal court.  The issue before us is only whether the evidence previously collected by state officers who it turned out lacked jurisdiction could be used in the federal prosecution against Little.

We hold that such evidence was admissible against Little under the good faith exception to the Fourth Amendment's exclusionary rule.  As previously explained by this court, the Creek, the federal government, and the State of Oklahoma all believed for at least a century before and during the investigation in this case that Oklahoma had jurisdiction over offenses committed on Creek land after Oklahoma became a state.  While we held in 2017, in Murphy v. Royal, 875 F.3d 896 (10th Cir. 2017), aff'd sub nom. Sharp v. Murphy, 140 S. Ct. 2412 (2020), that the Creek Reservation had not been disestablished and therefore the State of Oklahoma lacked jurisdiction over offenses committed on the Reservation, likely because that decision was so novel and impactful, we stayed the mandate in that case pending Supreme Court review.  See id. at 966.  The context surrounding our decision to stay the mandate could reasonably have been interpreted by Oklahoma law enforcement officers as

2

indicating that they could continue investigating offenses on Creek land pending Supreme Court review. Specifically, the motion to stay the mandate in Murphy argued that without a stay, Oklahoma would have to immediately cease investigating offenses on Creek land, and the federal government would have to fill that law enforcement void overnight. Oklahoma's state law enforcement and judicial system continued to operate after Murphy under the assumption that it still had jurisdiction over such offenses. Under these unique circumstances, we conclude that exclusion of the evidence collected through the state investigation of Little is unwarranted—state officers' conduct was not sufficiently deliberate or culpable to suggest that exclusion would have a significant deterrent effect, and any deterrent effect is heavily outweighed by the social costs of exclusion—the loss of evidence generated in good faith by state officers in Oklahoma between our Murphy decision in 2017 and the Supreme Court's McGirt decision in 2020.

Little raises many other arguments for reversal, all of which are either waived, forfeited or lack merit. Having jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we therefore AFFIRM.

## I. BACKGROUND

Prior to 2015, Defendant Justin Little and Hannah Watkins dated for many years and eventually had a baby together. In early 2015, Watkins told Little that she no longer wanted to be romantically involved with him. After that time, Watkins had other boyfriends, and Little frequently tried to interfere with her relationships. For example, Watkins began dating Leon Hoang in late 2015. The first time Watkins

3

stayed with Hoang, Little drove two hours to his residence, arrived at 3:00 or 4:00 a.m., and informed Watkins that he was worried about her and had a colleague track her phone for him. In January 2017, Little was at a gathering with Watkins and her then-boyfriend, Justin Lackey. Watkins noticed Little leave the building and re-enter with dust and grass on his back—as if Little had been lying on the ground—and Lackey later discovered that his brake lines had been cut. After Lackey, Watkins dated Dennis Mitchell. Little found out about the relationship and messaged Mitchell on Facebook, falsely telling Mitchell that he and Watkins were intimate again and that Watkins had sent him photos. Little sent Mitchell semi-clothed and nude photos of Watkins.

Watkins then began dating Jonathan Weatherford, the victim in this case, in November 2017. About a month later, Little messaged Watkins on Facebook and stated that he wished their son "could enjoy his family together." (I ROA 538.) On March 19, 2018, Little purchased a 783 Remington .300 Winchester Magnum rifle. He also owned a handgun, which he regularly kept in his truck. Little's truck was a white Chevy Silverado with a sticker on the back left windshield.

In April 2018, Watkins told Little that she was very serious about Weatherford and planned to stay with him for the rest of her life. Little—who served in the military and had been enlisted for six years—told Watkins that their son could only receive military benefits if he and Watkins were married. This was a lie, but Watkins believed it and married Little on April 19, 2018. Three days later, on April 22, Little

4

had plans to visit Watkins's apartment in Jenks, Oklahoma, but called to tell her he was running late.

At about the same time, Weatherford, who had been staying with Watkins, apparently left her apartment and began walking down railroad tracks near a high school aquatic center.  Weatherford was subsequently found shot and killed on the railroad tracks around 12:00 p.m.  Little arrived at Watkins's apartment around 12:10 p.m.

Jenks Police Department (JPD) Assistant Chief Melissa Brown arrived at the crime scene and initiated the investigation.  JPD officers canvassed the area surrounding the crime scene and determined that the shooting occurred around 11:55 a.m. after speaking to over thirty people.  Chief Brown spoke to Watkins near the scene, and Watkins provided details regarding Little's vehicle.  Officers reviewed surveillance footage from various locations near the crime scene and identified a white Chevy Silverado matching the description of Little's vehicle in the area around the time of the shooting.  Surveillance footage collected from the investigation showed Little's truck turning into the aquatic center parking lot, driving to a nearby industrial lot, and parking moments before a gunshot could be heard on the footage. Surveillance footage also showed Weatherford walking along the train tracks near where Little had parked and a figure in dark clothing following him.

Shortly after the shooting, multiple people came to the police station and told police about prior incidents between Weatherford and Little.  Oklahoma state officers arrested Little later that day.

Little was taken to the police station, where he was read the Miranda rights and signed a waiver. Little was then interviewed by Chief Brown and Officer Jason Weis. He eventually admitted that he was in Jenks that day and saw Weatherford walking on the train tracks.

Officers went to the home shared by Little and his mother. Little's mother consented to the officers' seizure of Little's rifle, which was found in the living room where Little slept. Officers also found a lens cap to the scope of Little's rifle in the bed of his truck.

The next morning, April 23, Chief Brown interviewed Little with Detective Nicholas Chandlee. Chief Brown began the interview by telling Little that his Miranda rights "still st[ood]" and asking whether Little still wanted to speak with the officers, and Little responded affirmatively. (Id. at 354.) Chief Brown stopped the interview after Little expressed his desire to speak with an attorney.

## II. PROCEDURE

A federal grand jury indicted Little for first-degree murder in Indian country. 18 U.S.C. §§ 1111(a), 1153. After a jury trial, Little was convicted on that charge. The district court imposed a mandatory life sentence.

## III. DISCUSSION

**1. The district court did not err in denying Little's motions to suppress the evidence gathered by the JPD investigation, which was used in the subsequent federal criminal trial.**

    **a. Standard of Review**

6

"In reviewing a district court's denial of a motion to suppress, this court considers the totality of the circumstances and views the evidence in the light most favorable to the government."  United States v. Madden, 682 F.3d 920, 924 (10th Cir. 2012) (citing United States v. Kimoana, 383 F.3d 1215, 1220 (10th Cir. 2004)).  "The district court's factual findings are reviewed for clear error."  Id.  The district court's legal conclusions are reviewed de novo.  United States v. Smith, 606 F.3d 1270, 1275 (10th Cir. 2010).

      **b.  Evidence obtained through the Jenks Police Department investigation was admissible in the subsequent federal prosecution of Little under the good faith exception, even though the JPD lacked jurisdiction to gather that evidence.**

Little, an Indian, shot and killed Weatherford on the Muscogee Creek Reservation, and therefore officers of the Jenks, Oklahoma, Police Department lacked jurisdiction when they investigated the homicide, arrested and interrogated Little, and searched Little's home.  See McGirt v. Oklahoma, 591 U.S. 894, 932, 937-38 (2020) (holding Congress had not disestablished the Creek Reservation, and therefore state lack jurisdiction over offenses committed thereon); 18 U.S.C. § 1153.  Little moved to suppress all evidence obtained from the JPD investigation on that basis.  The district court denied that motion on the ground that the JPD officers reasonably could have believed at the time of the investigation that Oklahoma had jurisdiction to investigate and prosecute this offense.

The question we must answer here is whether the evidence obtained from JPD's investigation without jurisdiction should have been excluded in the subsequent

7

federal prosecution or whether the Leon[1] good faith exception to the exclusionary

rule applies. "To remedy Fourth Amendment violations, federal courts ordinarily invoke

and apply the exclusionary rule, precluding the government from introducing at trial

unlawfully seized evidence." United States v. Pemberton, 94 F.4th 1130, 1137 (10th

Cir. 2024). But exclusion is not an automatic remedy—instead, "applying the

exclusionary rule may not always be the appropriate remedy for a Fourth Amendment

violation in a particular case." Id. The exclusionary rule is "a judicially created remedy

designed to safeguard Fourth Amendment rights generally through its deterrent effect."

United States v. Calandra, 414 U.S. 338, 348 (1974). Given the rule's deterrence

rationale, the Supreme Court has explained:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that
> exclusion can meaningfully deter it, and sufficiently culpable that such deterrence
> is worth the price paid by the justice system. As laid out in our cases, the
> exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct,
> or in some circumstances recurring or systemic negligence.

Herring v. United States, 555 U.S. 135, 144 (2009).

The Court has further explained that "[r]eal deterrent value is a 'necessary

condition for exclusion,' but it is not 'a sufficient' one." Davis v. United States, 564

U.S. 229, 237 (2011) (quoting Hudson v. Michigan, 547 U.S. 586, 596 (2006)). The

exclusion analysis "must also account for the 'substantial social costs' generated by"

the exclusionary rule, such as the loss of "reliable, trustworthy evidence bearing on

guilt or innocence." Id. (quoting Leon, 468 U.S. at 907). Ultimately, "[f]or exclusion

---

[1] United States v. Leon, 468 U.S. 897, 907 (1984).

8

to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Id.

The Supreme Court has recognized a good faith exception to the exclusionary rule. In Leon, the Supreme Court held that when officers execute a search "in objectively reasonable reliance on a subsequently invalidated search warrant," exclusion of the fruits of that search is generally not warranted. 468 U.S. at 922. The Court explained that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable police activity." Id. at 919. Since Leon, the Supreme Court has extended its holding and applied the good faith exception in a variety of cases where officers acted objectively reasonably under the circumstances, even in the absence of a search warrant. See Illinois v. Krull, 480 U.S. 340, 342, 349-50 (1987) (applying the good faith exception where officers acted in objectively reasonable reliance on a state statute authorizing warrantless administrative searches that was subsequently declared unconstitutional); Arizona v. Evans, 514 U.S. 1, 3–4, 14–15 (1995) (applying the good faith exception where officers acted in objectively reasonable reliance on erroneous information in a database maintained by judicial employees); Davis, 564 U.S. at 239–41 (applying the good faith exception where officers conducted a warrantless traffic stop and arrest in objectively reasonable reliance on binding appellate precedent).

We recently applied the good faith exception to a case involving circumstances similar to Little's case. In United States v. Pemberton, this court addressed a murder committed in McIntosh County, Oklahoma, which "straddle[s] the Creek Nation and

9

the Cherokee Nation reservations"; "the murder, certain parts of the investigation, and Mr. Pemberton's arrest occurred within these reservations." 94 F.4th 1130, 1133-1134 (10th Cir. 2024).[2] In Pemberton, we held that exclusion of evidence was unwarranted where state officers—acting without jurisdiction—obtained and executed a search warrant and arrested a defendant in 2004 for an offense committed on the Cherokee Reservation because the state officers acted with a reasonable, good faith belief that they had jurisdiction to conduct their activity. Id. at 1138, 1140. We reasoned, "the historical record provides evidence that government officials from the Creek, the State of Oklahoma, and the United States held and expressed the belief that the Creek reservation did not continue to exist after Oklahoma became a state." Id. at 1138. As detailed by Chief Justice Roberts's dissent in McGirt, Congress eliminated the tribal courts on the Creek Reservation in 1898, and when Oklahoma became a state in 1907, "the federal government immediately ceased prosecuting [serious crimes committed by Indians] in federal court," and "Oklahoma immediately began prosecuting those crimes in state court." McGirt, 591 U.S. at 952, 963; Pemberton, 94 F.4th 1138. Given this background, we held in Pemberton that the state officers who investigated and arrested the defendant in that case, which

---

[2] While McGirt and the present case involve offenses committed on the Creek Reservation, this court relied on a concession by counsel in Pemberton that the disestablishment analysis from McGirt applies equally to the Cherokee Reservation. Pemberton, 94 F.4th at 1136 n.4.

involved an offense that had occurred on the Cherokee Reservation, could reasonably believe that they had jurisdiction.  Pemberton, 94 F.4th at 1138.[3]

While Pemberton is instructive here, it is materially distinguishable.  The state investigation and arrest in Pemberton occurred in 2004, whereas the investigation in Little's case occurred in April 2018.  Between those two dates, this court published (and then stayed the mandate pending certiorari) its decision in Murphy v. Royal, 875 F.3d 896 (10th Cir. 2017), aff'd sub nom. Sharp v. Murphy, 140 S. Ct. 2412 (2020).  In Murphy, we held that Congress had not disestablished the Creek Reservation—the same holding reached by the Supreme Court three years later in McGirt.  Murphy, 875 F.3d at 966.  Therefore, Little argues, Murphy put JPD officers on notice before April 2018 (when the current state investigation occurred) that they lacked jurisdiction to investigate the homicide in this case, which occurred on the Creek Reservation—notice that was lacking in Pemberton in 2004 when state officers there conducted the investigation and arrest.

We conclude that Murphy does not defeat application of the good faith exception in this case.  To the contrary, between this court's Murphy decision and the

---

[3] Pemberton specifically supports the application of the good faith exception to the warrantless police conduct at issue here.  Generally, "Leon's good-faith exception to the exclusionary rule . . . applies only narrowly outside the context of a warrant."  United States v. Herrera, 444 F.3d 1238, 1251 (10th Cir. 2006).  However, we applied the good faith exception in Pemberton to evidence obtained from a warrantless arrest.  Pemberton, 94 F.4th at 1140.  We explained that, if officers could reasonably believe that they had jurisdiction to seek a search warrant to investigate such offenses, then they could also reasonably believe that they had jurisdiction to conduct lawful warrantless investigative operations for the same offenses.

11

Supreme Court's decision in McGirt, the holding of Pemberton controls—state officers could reasonably believe that they could lawfully investigate offenses on the Creek Reservation.

First, after we issued our opinion in Murphy, we granted the appellee's unopposed motion to stay the mandate in that case, and that stay lasted until after the Supreme Court decided McGirt and affirmed our decision in Murphy in 2020.[4] Second, as explained in Pemberton, the Creek, the State of Oklahoma, and the United States all believed for over a century that the state had jurisdiction over offenses committed on the Creek Reservation, and the state had been investigating and prosecuting such offenses during that time. Therefore, immediate compliance with our decision in Murphy, notwithstanding that the mandate had been stayed, would have required an overnight sea change in criminal investigation and prosecution—the state criminal system would have had immediately to cease its operations regarding offenses on the Creek Reservation, and the federal government would have had to take over all investigations and prosecutions. Third, the context surrounding our decision to stay the mandate in Murphy specifically indicated to law enforcement that the issuance of our opinion in that case did not require the overnight sea change

---

[4] We stayed the mandate "for 90 days and/or until the deadline passe[d] for filing a certiorari petition in the Supreme Court," and provided that the stay would continue "until the Supreme Court's final disposition" if this court received notice that the respondent had filed a certiorari petition. Order Granting Unopposed Motion to Stay the Mandate Pending the Filing of a Petition for Writ of Certiorari, Murphy, 875 F.3d 896 (Nos. 07-7068, 15-7041). Royal filed a petition for certiorari on February 6, 2018. The mandate issued on August 26, 2020.

described above.  While we granted the motion to stay the mandate in a brief order

without substantive analysis, the unopposed motion that we granted argued that there

was "good cause" to stay the mandate under Fed. R. App. P. 41(d)(2)(A) because:

> [i]f the mandate issue[d], it would [have] create[d] the need to execute a
> significant shift in how law enforcement and criminal prosecution is conducted
> in the area at issue, involving substantial resource expenditure by state,
> federal, and tribal governments that may not be necessary in light of the
> possibility of reversal by the U.S. Supreme Court.

Unopposed Motion to Stay the Mandate Pending the Filing of a Petition for Writ of

Certiorari at 3, Murphy, 875 F.3d 896 (Nos. 07-7068, 15-7041).  Additionally, in his

concurrence in the denial of rehearing en banc in Murphy, then-Chief Judge

Tymkovich stated, "this case might benefit from further attention by the Supreme

Court."  Murphy, 875 F.3d at 966 (Tymkovich, C.J., concurring in the denial of

rehearing en banc).[5]  Fourth, it appears that the criminal justice system in Oklahoma

continued to operate after Murphy under the assumption that it had jurisdiction over

offenses committed on the Creek Reservation.  For example, in our recent

unpublished decision in United States v. Bailey, we applied the good faith exception

where state officers obtained and relied on a state warrant when investigating an

offense committed on the Creek Reservation in May 2020—before the Supreme

Court decided McGirt.  No. 23-5044, 2024 WL 3101681, at *1 (10th Cir. June 24,

2024); see also Bosse v. State, 499 P.3d 771, 774 (Okla. Crim. App. 2021) ("[N]o

---

[5] While the Supreme Court did not grant certiorari in Murphy until May 21, 2018—after the April 2018 investigation in this case—there was still uncertainty regarding the future of our Murphy decision in April 2018 given the pending certiorari petition and the context surrounding the stay of our mandate.

final decision of an Oklahoma or federal appellate court had recognized any of the Five Tribes' historic reservations as Indian Country prior to McGirt in 2020." (emphasis added)).

Based on these facts, a state officer acting in good faith after Murphy—but before McGirt—could reasonably have believed that they could continue lawfully to investigate offenses committed on the Creek Reservation.  Our stay of the mandate in Murphy, suggestions of the likely reason for doing so—to prevent a massive sea change in criminal law enforcement that could have been entirely undone had the Supreme Court reversed—and the systemic continuation of generally accepted Oklahoma state law enforcement operations regarding offenses committed on the Creek Reservation all supported that conclusion.  Or, at the very least, these circumstances created significant uncertainty that we cannot conclude that there was clearly established law that Oklahoma officials lacked authority to arrest and investigate Little.  Oklahoma state officers faced a difficult decision after we decided Murphy and stayed the mandate—immediately comply with our opinion, while potentially allowing offenses in Indian country to go without investigation while the federal government scrambled to fill the law enforcement void, or rely on multiple sources, including the motion to stay the mandate that we granted and authority from Oklahoma courts, that suggested that state officers did not need to cease their operations regarding such offenses during that time.  The doubts surrounding the state of the law after Murphy were only conclusively resolved by the Supreme Court's decision in McGirt in 2020.  Given that fact and the unique nature of the

14

issue presented in <u>Murphy</u> and <u>McGirt</u>, we are not persuaded that application of the exclusionary rule in this case would have any meaningful deterrent effect. Ultimately, we cannot say that the wrongful conduct of the JPD officers who investigated and arrested Little was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." <u>Herring v. United States</u>, 555 U.S. at 144.

This is especially true given the systemic nature of investigations and arrests by state officers without jurisdiction that occurred in Indian country between our decision in <u>Murphy</u> and the Supreme Court's decision in <u>McGirt</u>. Here, unlike the typical good faith case, the constitutional issue extends far beyond the facts of Little's case—it implicates every investigation conducted by state officers in Indian country after our <u>Murphy</u> decision but before the Supreme Court decided <u>McGirt</u>. Given the unlikely deterrent value of the exclusionary rule under these circumstances and the substantial social costs that would result from its application here—the suppression of all evidence obtained by Oklahoma state officers investigating offenses in Indian country between <u>Murphy</u> in 2017 and <u>McGirt</u> in 2020—we conclude that exclusion is not warranted.

Our analysis in this case is limited to the circumstances faced by Oklahoma state officers here. Therefore, we are not altering the generalized rule that our opinions have precedential effect when issued, even when the mandate has not yet issued. <u>See, e.g.</u>, <u>In re Zermeno-Gomez</u>, 868 F.3d 1048, 1052 (9th Cir. 2017) ("[W]e have held that a stay of the mandate does not 'destroy the finality of an appellate court's

15

judgment,' and that a published decision is 'final for such purposes as stare decisis, and full faith and credit, unless it is withdrawn by the court.'" (citation omitted)).  Nor are we suggesting that states and officers need not immediately comply with our precedential decisions when issued.  Instead, we hold only that, given the combination of unique circumstances facing state officers in Oklahoma after our Murphy decision in 2017 but before McGirt in 2020, and the policy reasons behind the exclusionary rule, exclusion of evidence collected during the investigations of offenses on the Creek Reservation is not warranted.

### c.  Officers had probable cause to arrest Little.

We review the district court's probable cause determination de novo.  United States v. Biglow, 562 F.3d 1272, 1280 (10th Cir. 2009).  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." United States v. Johnson, 43 F.4th 1100, 1107 (10th Cir. 2022) (citations omitted).  "The probable-cause standard requires only a fair probability, a standard understood to mean something more than a bare suspicion but less than a preponderance of the evidence at hand." Id. (cleaned up).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 543 U.S. 146, 152 (2004).

Officers arrested Little just eight hours after the shooting, and they had done the following by that time: taken statements from over thirty people in the areas

16

surrounding the scene of the shooting from which officers determined that the

shooting occurred around 11:55 AM; received a statement from Watkins providing

Little's name and a description of his vehicle; reviewed surveillance video from

nearby cameras and identified a vehicle matching the description of Little's vehicle

driving towards the scene around the time of the shooting; taken grainy photos of a

screen displaying the surveillance video because they could not get a tape of the

video; and taken statements from multiple witnesses who visited the police station

and informed officers of prior altercations between Little and Weatherford—

including Weatherford's ex-girlfriend, who informed police that Little had previously

threatened Weatherford.

This evidence supported a "fair probability" that Little killed Weatherford at

the time officers arrested Little.  Johnson, 43 F.4th at 1107.[6]  Therefore, we reject

Little's challenge to the district court's probable cause determination.

### d. Officers' entry into Little's home and seizure of his rifle did not violate the Fourth Amendment.

Little argues that officers' entry into his home violated the Fourth Amendment

because the government has failed to establish that his mother, who shared the home

---

[6] We are unpersuaded by Little's argument that the evidence at trial indicates that officers did not actually view the surveillance footage of Little's vehicle before they arrested him.  Chief Brown testified at trial that police did not "have" surveillance video before arresting Little, but only "had" the grainy photos of the video.  (I ROA 636).  But Chief Brown also provided testimony indicating that police reviewed the video before the arrest: "Although there were a lot of people at the aquatic center, there weren't a lot of people driving on the road at that time, surprisingly enough, so [Little's vehicle] just kind of stood out when we were looking at the video footage."  (Id. at 634) (emphasis added).

17

with Little and was present at the time, voluntarily consented to the officers' entry—and consent is the only basis by which the government attempts to justify the search. Therefore, Little argues, his rifle, which was seized during the allegedly unlawful search of his home, should have been suppressed. Little's arguments lack merit.

"Consent is an exception to the Fourth Amendment's warrant requirement for a search of a residence." United States v. Romero, 749 F.3d 900, 905 (10th Cir. 2014). "For consent to be valid, two conditions must be met: '(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied.'" United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007) (quoting United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992)).

Little argues that the government has not presented any evidence that Little's mother consented to the initial entry into his home, as the government relies solely on footage from Chief Brown's body camera, which did not start recording until officers had already entered the home. Little has forfeited this argument by failing to raise it below or argue plain error on appeal. United States v. Wright, 848 F.3d 1274, 1281 (10th Cir. 2017). Little only argued below that his mother lacked authority to consent to the search and that the government cannot prove that her consent was free, voluntary, and not the product of duress—not that his mother did not consent to officers' initial entry.[7] Had Little raised that argument below, the government could

---

[7] Little does not argue on appeal that his mother lacked authority to consent to the search.

have developed evidence on that issue.  See United States v. Dominguez-Perez, 772

F. App'x 623, 627 (10th Cir. 2019) (unpublished) (holding that the defendant waived

factual challenges because the defendant "failed to advance them below," and

therefore this court "lack[ed] an adequate record against which to review them").

Little also argues that the government failed to prove that his mother clearly

consented to the officers' entry into the living room, which was also Little's

bedroom.  We disagree.  "[C]onsent must be clear, but it need not be verbal.  Consent

may instead be granted through gestures or other indications of acquiescence, so long

as they are sufficiently comprehensible to a reasonable officer."  Guerrero, 472 F.3d

at 789-90.  Here, when officers asked Little's mother if she could show them Little's

firearms, she led officers into the living room and pulled Little's rifle from a pile of

his property.  Officers then asked if they could take the rifle, and Little's mother

responded, "[y]eah," while nodding.  (Aplee. Br. 23.)  Little's mother's actions—

leading the officers into the living room—demonstrate implied consent to the

officers' entry into the living room.  See, e.g., United States v. Guillen, 995 F.3d

1095, 1104 (10th Cir. 2021) ("The district court likewise did not clearly err when it

determined Ethan impliedly consented to the entry by stepping away from the

doorway and allowing the agents to enter the house.").

Finally, Little argues that his mother was distraught during her interaction with

the police, and therefore her consent was not voluntary but was instead given under

duress.  As an initial matter, this argument is likely forfeited.  Little raised this

argument in a cursory manner below and did not explain the basis for his argument

that Little's mother was under duress when she gave officers consent to enter the home. Nonetheless, even if Little's mother was "emotionally distraught with the news of the shooting and her son's arrest," nothing in the record indicates that her emotions were "so profound as to impair her capacity for self-determination or understanding of what the police were seeking." (Aplt. Br. 27-28); United States v. Duran, 957 F.2d 499, 503 (7th Cir. 1992) (primary case upon which Little relies). Therefore, we conclude that her consent was voluntarily given.

### e. Officers' interrogation of Little did not violate the Fifth Amendment.

Little makes three arguments with respect to the Fifth Amendment: 1. Officers violated his Fifth Amendment rights under Miranda by interviewing him a day after giving him Miranda warnings without repeating the warnings; 2. Officers ignored Little's purported invocation of his right to counsel during his second interview; and 3. Officers coerced Little's statements during his interviews. None of these arguments have merit.

### i. Officers did not violate the Fifth Amendment when they did not re-Mirandize Little a day after giving him the warnings.

The Supreme Court held in Miranda v. Arizona that a person's statements made during custodial interrogation are not admissible at trial against that person unless the person was apprised of his rights before questioning. 348 U.S. 436, 444 (1966). The parties here do not dispute that Little was subject to custodial interrogation during both interviews by police, and therefore the protections of Miranda applied. When Chief Brown and Officer Weis first interviewed Little

20

immediately after his arrest on April 22, Chief Brown read him the <u>Miranda</u> warnings, and Little signed a waiver and agreed to speak with them. However, after that interview ended and Chief Brown and Detective Chandlee initiated a second interview on April 23, they did not read Little the <u>Miranda</u> warnings again. Instead, Chief Brown informed Little that his <u>Miranda</u> rights "still st[ood]" and asked Little if he wanted to continue talking with the officers. (I ROA 148). Little responded affirmatively, and the officers continued to question Little.

<u>Miranda</u> warnings remain effective for subsequent questioning "unless the circumstances change[] so seriously that [the subject's] answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." <u>Mitchell v. Gibson</u>, 262 F.3d 1036, 1058 (10th Cir. 2001) (quoting <u>Wyrick v. Fields</u>, 459 U.S. 42, 47 (1982)). "In making this assessment, the Court look[s] to whether the character of the interrogation had changed significantly, and whether the questions put to the defendant subsequently would have caused him to forget the rights of which he had been advised and which he had previously understood." <u>Mitchell</u>, 262 F.3d at 1058 (citing <u>Wyrick</u>, 459 U.S. at 47-49). In <u>Mitchell</u>, this court rejected "the argument that the passage of time alone invalidates previously given <u>Miranda</u> warnings." <u>Id.</u> at 1057. In doing so, this court joined other circuits—including the Ninth Circuit in <u>United States v. Andaverde</u>, which this court cited in <u>Mitchell</u>. <u>See</u> <u>United States v. Andaverde</u>, 64 F.3d 1305, 1313 (9th Cir. 1995) (holding statements by the defendant to his parole officer the day after the defendant received <u>Miranda</u> warnings were

admissible); United States v. Clay, 408 F.3d 214, 222 (5th Cir. 2005) (holding the defendant's confession, made two days after he received Miranda warnings, was admissible).

Applying these principles here, we conclude that the circumstances of the April 23 interrogation did not change so seriously that Little's statements were no longer voluntary or Little no longer understood and knowingly relinquished his rights. While there was a change in secondary officers—Officer Weis joined Chief Brown during the April 22 interrogation, and Detective Chandlee replaced Weis for the April 23 interrogation—Chief Brown was involved in both interrogations. And, as found by the district court, all other aspects of the interrogations were similar— they took place in the "same room, discussing the same events, based on the same history." (I ROA 354). Therefore, officers did not need to re-Mirandize Little for his statements on April 23 to be admissible against him.[8]

---

[8] We are not persuaded by the cases Little cites to support his argument that officers needed to re-Mirandize him on April 23. See, e.g., Coddington v. Sharp, 959 F.3d 947, 951, 959-60 (10th Cir. 2020) (rejecting argument that the defendant needed to be re-Mirandized when he was interrogated at a police station about three hours after he was Mirandized at his home when officers asked the defendant if he remembered being read, and waiving, the Miranda rights, and the defendant responded affirmatively—especially given the defendant's previous experience with law enforcement and the Miranda warnings). While Chief Brown did not ask Little if he remembered the Miranda warnings and his waiver, and therefore Coddington is distinguishable, she did inform Little that his rights "still st[ood]" and confirmed that he wanted to continue speaking to the officers. When combined with the factors discussed above, this was sufficient to support our conclusion that circumstances had not changed so seriously that Little no longer understood his rights.

**ii. Little did not unequivocally invoke his right to counsel.**

Little argues that he unequivocally invoked his right to counsel at the start of the April 23 interrogation. Chief Brown told Little that his Miranda rights "still st[ood]" and asked Little, "[s]o you still want to talk to us?" (I ROA 148). Little's response was, "[y]eah, I can still talk to y'all." "I wanted to talk to a lawyer because I just wanted to see where I stand at right now is all." (Id.).

"[C]ustodial interrogation may continue unless and until the suspect *actually invokes* his right to counsel; ambiguous or equivocal statements that *might* be construed as invoking the right to counsel do not require the police to discontinue their questioning." United States v. Nelson, 450 F.3d 1201, 1212 (10th Cir. 2006) (emphasis in original) (citing Davis v. United States, 512 U.S. 452, 458-59 (1994)). The test for whether a suspect invoked his right to counsel is an objective inquiry which asks whether the suspect's statement is "'sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Nelson, 450 F.3d at 1212 (quoting Davis, 512 U.S. at 459).

Here, Little's statement was ambiguous. He began by stating that he could "still talk" to the officers. Additionally, his statement that he "wanted to talk to a lawyer" so that he could "see where he [stood] at" could have been understood by a reasonable officer to mean multiple different things—for example, that Little wanted to speak to a lawyer at that moment, or that Little had previously wanted to speak to a lawyer but no longer wanted to. Therefore, Little did not unequivocally invoke his right to counsel at the start of the April 23 interrogation, and officers did not violate

23

his rights under <u>Miranda</u> by continuing the interrogation.  <u>See</u> <u>Nelson</u>, 450 F.3d at

1212 (officers need not ask "clarifying questions in response to an equivocal or

ambiguous statement").[9]

### iii.  Little's statements were voluntary.

"The voluntariness of a statement depends upon an assessment of the totality

of all the surrounding circumstances including both the characteristics of the accused

and the details of the interrogation."  <u>United States v. Cash</u>, 733 F.3d 1264, 1280

(10th Cir. 2013) (cleaned up).[10]

> In applying a totality of circumstances analysis, we have considered "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to any physical punishment."

<u>Id.</u> at 1280-81 (citation omitted).  "[C]oercive police activity is a necessary predicate

to the finding that a confession is not 'voluntary.'"  <u>Colorado v. Connelly</u>, 479 U.S.

157, 167 (1986).  "Ultimately, the proper inquiry is whether the confession was 'the

product of an essentially free and unconstrained choice,' or whether the individual's

---

[9] The case upon which Little relies to support his invocation argument, <u>United States v. Giles</u>, 967 F.2d 382 (10th Cir. 1992), does not help him, as that case was decided before the Supreme Court clarified the standards to be applied when considering invocations in <u>Davis</u> (1994).

[10] A criminal defendant can challenge the admission of his own involuntary statements under both the privilege against self-incrimination and the Due Process Clause.  It is unclear from Little's brief which theory he is presenting on appeal. However, the inquiry is the same under either theory.  <u>Cash</u>, 733 F.3d at 1280.

24

'will has been overborne.'" Carter v. Bigelow, 787 F.3d 1269, 1295 (10th Cir. 2015) (citation omitted).

The district court provided a summary of the circumstances of the interrogation:

> JPD questioned him for approximately two (2) hours the first evening and one (1) hour the next morning. Brown, Weis, and Chandlee[, the three officers involved in the interrogation,] did not use or threaten the use of physical punishment. The only brief physical contact occurred when Defendant reached across a table to point at something on Weis' notepad and Weis brushed his hand back. Miranda safeguards were clearly given and . . . applied to both the April 22 and April 23 interviews. Defendant did not exhibit any physical or mental difficulties, instead remaining coherent, generally polite, and conversational throughout the interviews. The interrogations took place in an office at JPD with padded chairs, good lighting, and drinking water easily available.

(I ROA 357).

Under these circumstances, we conclude that Little's statements during the interrogations were voluntary. None of Little's counterarguments are persuasive. First, Little argues that his age at the time of the interrogation—twenty four—and the fact that he had no previous experience with the criminal justice system weigh against a finding that his statements were voluntary. While these are relevant factors, Little's personal characteristics do not, on the whole, suggest he was "unusually susceptible to coercion"—instead, the record shows that he has a high school education and was enlisted in the military for six years prior to the interrogation. United States v. Toles, 297 F.3d 959, 966 (10th Cir. 2002) (citing the fact that the defendant was twenty one and received his GED as weighing against a finding of unusual susceptibility to coercion).

25

Second, Little argues that Chief Brown promised leniency if he confessed. "Promises of leniency . . . 'may render a confession coerced.'" United States v. Young, 964 F.3d 938, 943 (10th Cir. 2020) (citation omitted).  The district court, however, characterized Chief Brown's statements differently: "Throughout the interview, Brown told [Little] that it looked likely that he will be booked on and charged with first degree murder.  She asked him for mitigating information that would support a lesser booking or a lesser charge, which would potentially carry a lighter sentence." (I ROA 338-39).  Ultimately, officers did not promise leniency in exchange for a confession, but instead told Little he was likely facing a first-degree murder charge but might face a lesser charge if he provided "mitigating information."

Third, Little challenges the officers' "use[] [of] Little's son as leverage." (Aplt. Br. 31)  See United States v. Jacques, 744 F.3d 804, 811 (1st Cir. 2014) ("statements that a defendant's refusal to cooperate may lead to an extended separation from his or her loved ones may contribute to a finding that the defendant's confession was coerced," but "the mere fact that a defendant is placed 'under some psychological pressure' by agents does not necessarily render a confession involuntary" (citation omitted)).  As described by the district court, "Brown expressed regret at the idea of [Little] and his son being separated indefinitely if he was booked on and later convicted of first degree murder." (I ROA 339).  But the district court also found that the "Defendant was calm and level-headed throughout the interview." (Id. at 338).  So Chief Brown's references to Little's son do not weigh heavily for a finding of involuntariness. See Jacques, 744 F.3d at 811 (finding

26

that officers' reference to the suspect's father's health did not make the statement involuntary in part because the suspect did not manifest an emotional response to the statement and the record did not suggest a particular susceptibility to manipulation).

Fourth, Little argues that the officers relied on false evidence and deceit which rendered his statements involuntary. Chief Brown admitted to "bluffin" during the interrogation—for example, "[o]fficers told Little everyone knew he committed the shooting, referencing non-existent witness statements and Snapchat messages." (I ROA 358) (Aplt. Br. 31). Given the totality of the circumstances surrounding the interrogation as described above, these misrepresentations do not strongly support the conclusion that Little's statements were involuntary. See Lucero v. Kerby, 133 F.3d 1299, 1311 (10th Cir. 1998) ("[M]isrepresentations [about the state of the evidence], without more, do not render an otherwise voluntary confession involuntary.").

Finally, Little argues that the officers physically intimidated him during the interrogation. Statements that result from physical coercion are inadmissible. Young, 964 F.3d at 942. The incident challenged by Little occurred as follows:

> Toward the end of the recording, Weis and Defendant raised their voices with each other. Defendant reached across more than half the table and pointed at something on Weis' notepad. Weis brushed Defendant's hand back, which caused Defendant to immediately recoil and say, "Please don't touch me." When Weis asked why, Defendant said he felt "a little bit threatened right now," and Weis immediately apologized.

(I ROA 337-38). The record does not support Little's contention that he was physically intimidated into making his statements.

27

**2. Little has waived some of his appellate arguments under the invited-error doctrine.**

This court's "'invited-error doctrine precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt.'" United States v. McBride, 94 F.4th 1036, 1041 (10th Cir. 2024) (citation omitted).

Here, Little agreed to preadmit evidence of a handgun found in his truck and messages he sent to Watkins. Additionally, he proposed the jury instruction regarding the permissible purposes for which the jury could consider evidence of Little's "other acts" admitted under Fed. R. Evid. 404(b). Therefore, under the invited-error doctrine, Little has waived his challenge to that evidence and jury instruction.

**3. Little's remaining challenges fail on their merits.**

  **a. None of Little's evidentiary challenges have merit.**

This court reviews the district court's evidentiary rulings for abuse of discretion. United States v. DeChristopher, 695 F.3d 1082, 1095 (10th Cir. 2012).

For challenges not raised by motion or objection below, this court reviews for plain error. Fed. R. Crim. P. 52(b); United States v. Cristerna-Gonzalez, 962 F.3d 1253, 1260 (10th Cir. 2020). "To prevail, Defendant must show '(1) error, (2) that is plain, which (3) affects his substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Cristerna-Gonzalez, 962 F.3d at 1260 (citation omitted).

28

### i. The district court did not abuse its discretion in admitting other acts evidence.

After the government filed a notice of intent to offer other acts evidence under Fed. R. Evid. 404(b), Little moved to exclude the evidence. The district court granted Little's motion in part but allowed the admission of evidence of some prior acts, three of which are at issue here: 1. In 2015, Watkins was staying at the home of her coworker, Hoang, when Little appeared at 4:00 AM and eventually informed Watkins that he was tracking her cell phone; 2. In late 2016 or early 2017, Watkins and her boyfriend at the time, Lackey, suspected Little of cutting Lackey's brake lines; and 3. Little sent nude photographs of Watkins to another of her boyfriends, Mitchell. We review Little's appellate challenge to the admission of that evidence for abuse of discretion.

When analyzing the admissibility of other acts evidence, the court must first determine whether the evidence is "intrinsic" or "extrinsic." United States v. Kupfer, 797 F.3d 1233, 1238 (10th Cir. 2015). Evidence is intrinsic when it is "'directly connected to the factual circumstances of the crime and provides contextual or background information to the jury,'" and it is extrinsic when it "'is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" Id. Intrinsic evidence is admissible so long as it satisfies the requirements of Fed. R. Evid. 403—which asks whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice—while the admissibility

of extrinsic other acts evidence is controlled by Fed. R. Evid. 404(b).[11]  The district

court reached two alternative conclusions regarding the other acts evidence

challenged by Little: 1. It was intrinsic, as it provided a complete picture of the

background and context surrounding the homicide, and it was admissible under Rule

403; and 2. Even if it was extrinsic, it was admissible for a non-propensity purpose

under Rule 404(b)—to prove Little's motive, which was to keep his wife to himself.

We agree with the latter conclusion, so we need not consider the former.

There are four requirements for evidence to be admissible under Rule 404(b):

1. It must be "offered for a proper purpose"; 2. It must be relevant; 3. Its probative

value must not be substantially outweighed by its potential for unfair prejudice; and

4. Upon request, the trial court must "instruct the jury that the similar acts evidence is

to be considered only for the proper purpose for which it was admitted."  Huddleston

v. United States, 485 U.S. 681, 691-92 (1988).  All four requirements were satisfied

here.

First, in the government's notice of intent to offer evidence under Rule 404(b),

it explained, "Little's history with Watkins and her romantic partners illustrates

Little's motive for killing Weatherford."  (I ROA 49).  Second, the evidence was

relevant.  The government was required to show that Little shot and killed

---

[11] Fed. R. Evid. 404(b) provides: "(1) Prohibited Uses. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Weatherford with malice aforethought and premeditation, and the evidence of Little's history of hostility towards Watkins's other partners was highly probative of Little's motive for killing Weatherford—Watkins's partner at the time with whom she intended to stay for "the rest of [her] life." (Id. at 546). For this same reason, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Finally, as explained above, Little waived his appellate challenge to the Rule 404(b) jury instruction by proposing the instruction below.

Little raises two counterarguments. We find neither persuasive. First, he argues that the government did not provide sufficient evidence to prove that Little cut Lackey's brake lines in 2017. While "similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor," there was sufficient evidence supporting those conclusions here. Huddleston, 485 U.S. at 689. Specifically, Watkins testified that after a conversation at her grandmother's house between Lackey, Little, and her, Little went outside, where Lackey's car was located, and "sidestep[ped]" back inside. When Little came back inside, his back was dirty. Then, when Lackey and Watkins left, they realized Lackey's brake lines had been cut. (I ROA 522-25).

Little's second counterargument is that the prior acts were not similar enough to the charged offense—homicide—to support admission under Rule 404(b). See United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000) ("This court has previously recognized the probative value of uncharged acts to show motive, intent, and knowledge, whether the acts involved previous conduct or conduct subsequent to

31

the charged offense, as long as the uncharged acts are similar to the charged crime and sufficiently close in time."). While the prior acts occurred years before the homicide and one of the acts at least did not involve violent conduct—e.g., sending nude photographs—they all involved attempts by Little to interfere with Watkins's relationships and evinced a similar state of mind—Little's jealousy of Watkins's partners. In Zamora, we explained, "[t]he more similar the act or state of mind is to the charged crime, the more relevant it becomes." Zamora, 222 F.3d at 762 (emphasis added). Ultimately, we conclude that Little's prior acts were sufficiently similar to his shooting Weatherford to be admissible under Rule 404(b), and the district court did not abuse its discretion in denying Little's motion to exclude them.

### ii.  The district court did not abuse its discretion in admitting Little's rifle.

Little argued in his trial brief below that the district court should exclude the .300 caliber Remington rifle seized from his home and the lens cover to the rifle's scope, which was found in his truck.[12] The district court ruled that the rifle was

---

[12] Little does not challenge the admission of the lens cover on appeal. He appears separately to challenge the admission of the rifle and the rifle's scope, which was attached to the rifle. However, he did not raise a separate challenge to the admission of the scope before the district court. To the extent that he raises a separate challenge on appeal to the admission of the scope, that challenge is waived because he did not argue plain error in his appellate briefs. Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1130-31 (10th Cir. 2011).

In his reply brief, Little argues, "[t]he scope was attached to the rifle and therefore challenging the admission of the rifle encompassed the scope." (Aplt. Reply Br. 24). Therefore, we do not address the scope separately and instead focus on whether the district court abused its discretion in denying Little's request to exclude the rifle. !

admissible. Therefore, even though Little did not object to the admission of that evidence at trial when it was presented, this court reviews for abuse of discretion, not plain error. See Fed. R. Evid. 103(b) ("Once the court rules definitively on the record--either before or at trial--a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

Little argues that the rifle was not relevant, as required under Fed. R. Evid. 402, and that any probative value it had was substantially outweighed by the risk of unfair prejudice (see Fed. R. Evid. 403). To be relevant, as defined by Fed. R. Evid. 401, evidence need only have "any tendency to make a fact more or less probable than it would be without the evidence," and that fact must be "of consequence in determining the action." The rifle and scope are relevant under this standard: Weatherford was killed by the same caliber bullet as those shot from a .300 caliber Remington rifle; Little purchased the rifle a month before the homicide; the rifle was found in Little's home; and the lens cover for the rifle's scope was found in Little's truck shortly after the homicide. Given these facts, the rifle tended to make it more probable that Little killed Weatherford.[13] Additionally, given the high probative

---

[13] Little points to other evidence to suggest that the rifle was not relevant: "[t]here was not a rifle depicted in the surveillance videos that allegedly showed the killer running after Weatherford"; and "[t]he ballistics evidence demonstrated the bullet may have been fired from a Remington rifle or one of 42 other makes and models of guns." (Aplt. Br. 47). This evidence does not establish that the rifle was not relevant, but instead goes to the extent of the rifle's probative value. Given the very low threshold presented by Fed. R. Evid. 401 and 402, the district court did not abuse it discretion in concluding that the rifle was relevant.

value of the rifle, the district court did not abuse its discretion in concluding that the probative value was not substantially outweighed by the danger of unfair prejudice.[14]

### iii. The district court did not plainly err in admitting the bullet recovered from Weatherford's body.

Little concedes that plain error review applies to his challenge to the district court's admission of the bullet recovered from Weatherford's body, as he did not move to exclude the bullet or object to its admission below. Little argues that the district court plainly erred in admitting the bullet because the bullet was not relevant, as the government "did not establish [it] was the bullet recovered from Weatherford." (Aplt. Br. 48). We are unpersuaded: Chief Brown testified at trial that she attended Weatherford's autopsy and that photos from the autopsy—including photos of the bullet recovered from his body—accurately reflected the autopsy; the government's expert testified that the physical bullet admitted at trial was the bullet given to him by the government for examination; and the expert viewed autopsy photos of the bullet at trial and testified that the photos "appear[ed] to be consistent" with the bullet admitted at trial (I ROA 679-80). Therefore, admission of the bullet was not plain error.

---

[14] Little raises a second argument—that the rifle was not relevant because the government did not prove that the rifle was seized from Little's home—although he also stated in his reply, "[t]he issue is not chain of custody." (Aplt. Reply Br. 24). Nonetheless, the government presented evidence establishing that the rifle admitted at trial was the one seized from Little's home: Chief Brown testified that she seized the rifle from Little's home; she testified that a photograph admitted at trial depicted the rifle taken from Little's home; and a government expert who examined the rifle before trial testified that the rifle admitted at trial was the same rifle that was depicted in the photograph admitted at trial.

### iv.   The district court did not abuse its discretion in admitting statements by Watkins.

Little raises two preserved challenges to statements made by Watkins that were admitted at trial.  First, he argues that Watkins's statement to Little that she "planned on being with" Weatherford for "the rest of [her] life" was inadmissible hearsay under Fed. R. Evid. 802.  (I ROA 546).  The district court concluded that the statement was not hearsay because it was offered to prove the effect on the listener—Little—rather than "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c) (defining hearsay).  We agree.  The government did not use Watkins's statement to prove that Watkins, <u>in fact</u>, intended to stay with Weatherford for the rest of her life.  Instead, the government used the statement to prove that Little <u>believed</u> she was going to do so and therefore had a motive for killing Weatherford.[15]

---

[15] Neither of Little's counterarguments is persuasive.  First, Little argues that Watkins never testified regarding Little's reaction to her statement, and therefore the statement was not really admitted for the purpose of showing its effect on Little. (Aplt. Br. 50) (quoting <u>United States v. Graham</u>, 47 F.4th 561, 567 (7th Cir. 2022) ("A statement is offered to show an effect on the listener only if the listener heard and reacted to the statement . . . and if the 'actual use' of the statement at trial was to demonstrate the listener's response" (citations omitted)).  That is incorrect—the prosecutor asked Watkins how Little responded to her statement, and Watkins described Little's reaction.

Second, Little points to examples in the record that it believes demonstrate that the government used the statement for its truth.  For example, the government asked Watkins why she told Little that she intended to stay with Weatherford.  This does not undermine the government's argument that the statement was admitted to demonstrate its effect on Little—the government wanted the jury to hear Watkins's motivation for the statements, which was informing Little that she intended to be with Weatherford, not Little.

Second, Little argues that Watkins testified, contrary to a pretrial order, that she told police that she believed Little committed the homicide. We disagree. In a pretrial order, the district court granted Little's "motion to exclude Watkins[']s statements regarding who she believed was responsible for the murder." (I ROA 495). However, Watkins did not testify that she believed Little was responsible. Instead, the prosecutor asked Watkins, "[n]ot referencing Mr. Little, were you aware of anyone who wanted to hurt [Weatherford]?" Watkins responded, "[o]ther than him, no." (Id. at 556). This question did not violate the pretrial order and Mr. Little did not ask that the answer be stricken or limited.[16]

### b. None of the district court's jury instructions constitute reversible error.

Little forfeited his challenges to the district court's jury instructions by failing to object below, and therefore we review for plain error. Fed. R. Crim. P. 52(b); Wright, 848 F.3d at 1278-79.[17]

### i. The district court did not violate the procedural rules governing jury instructions.

---

[16] To the extent that Little argues on appeal that Watkins's statement was inadmissible hearsay, we disagree. Watkins did not testify about her prior statement when she was interviewed by police, but instead answered the prosecutor's question about her present recollection of what she believed at that time.

[17] Before selecting the jury, the district court asked both parties if they had "any exceptions either to an instruction I am giving or to one I'm not giving that you wish – that you proposed?" (I ROA 719). Both parties said no. The judge provided the jury with copies of the approved instructions on the first day of trial. Then, on the last day of trial, the judge gave the jury the final set of instructions—which were the same as the initial set of instructions except one instruction had been deleted and one had been added. Before giving the final instructions to the jury, the district court reviewed the instructions with the parties, and Little did not object.

As an initial matter, Little argues that the district court violated Fed. R. Crim. P. 30 when it gave the jury copies of the jury instructions on the first day of trial. Rule 30(c) provides, "[t]he court may instruct the jury before or after the arguments are completed, or at both times." We have recognized that Rule 30(c) gives the district judge wide discretion when determining how to instruct the jury. See United States v. Starks, 34 F.4th 1142, 1163 (10th Cir. 2022).[18] Ultimately, we reject Little's challenge under Rule 30 because here, unlike in Starks, the district court read the final instructions to the jury at the close of the case before the jury began deliberations.

### ii. The district court did not plainly err in failing to give Little's requested "mere presence" instruction.

Little challenges the district court's denial of his request to give the jury the following instruction: "Mere presence at the scene of a crime or mere knowledge that a crime is being committed is not sufficient to establish that the defendant committed the crimes charged in this case." (I ROA 453).

Generally, "[c]riminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." United States v.

---

[18] In Starks, the district court provided the jury with printed copies of the instructions and read the instructions to the jury before the parties presented evidence. Starks, 34 F.4th at 1150. The district court did not re-read most of the instructions before the jury began deliberations two days later. Id. at 1154. This court in Starks recognized the discretion provided to district judges by Rule 30(c), but we also explained "that some courts have deemed such an unconventional approach—involving the pre-evidence oral delivery of instructions—to be problematic and even legally erroneous, where, as here, the full set of instructions is not repeated at the end of the presentation of evidence." Id. at 1163.

Gallant, 537 F.3d 1202, 1233 (10th Cir. 2008) (citation omitted). However, "[i]t is not error to refuse to give a requested instruction if the same subject matter is adequately covered in the general instructions." United States v. Miller, 460 F.2d 582, 588 (10th Cir. 1972). We have previously applied this principle and held that a district judge did not err in refusing to give a "mere presence" instruction requested by the defendant when the jury was instructed that, to find the defendant guilty, there must be evidence of the defendant's "willful association and willful participation." United States v. Alonso, 790 F.2d 1489, 1496-97 (10th Cir. 1986). In other words, a "mere presence" instruction—explaining that mere presence at the scene is insufficient—is effectively redundant of an instruction explaining that the defendant must have willfully participated in the criminal activity to be found guilty.

Here, the first-degree murder instruction given by the district court explained that, to find Little guilty, the jury needed to conclude that he "killed the victim with malice aforethought." (I ROA 881). Therefore, the "mere presence" instruction was not necessary—if the jurors concluded that Little killed the victim, they were necessarily not convicting based only on Little's "mere presence" at the scene. Ultimately, Little fails to establish that the district court's denial of his requested "mere presence" instruction was error, let alone plain error.

### iii. The district court's reasonable doubt instruction was not plainly erroneous.

The district court's reasonable doubt instruction stated, in relevant part:

If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on

38

the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

(I ROA 874) (emphasis added).  Little argues that the underlined sentence shifted the burden to him.  We disagree, as we have previously approved the language challenged by Little.  See United States v. Petty, 856 F.3d 1306, 1310 (10th Cir. 2017) ("[T]he firmly convinced language, juxtaposed with the insistence that a jury must acquit in the presence of a real possibility that the defendant is not guilty, is a correct and comprehensible statement of the reasonable doubt standard." (cleaned up)).  Therefore, Little has failed to establish that the reasonable doubt instruction was plainly erroneous.

### iv.  The district court's credibility instruction was not plainly erroneous.

Little challenges the district court's credibility instruction, which stated, in relevant part: "[Y]ou should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon."  (I ROA 879).  Little argues that this instruction favored the government's evidence because multiple government witnesses failed to recall important information.  Little has failed to establish plain error.

The Supreme Court has explained that district courts must "use great care that an expression of opinion upon the evidence should be so given as not to mislead, and especially that it should not be one-sided."  Quercia v. United States, 289 U.S. 466, 470 (1933) (cleaned up).  But the district court's instruction here was not one sided— it merely instructed the jury to consider that misrecollection is not uncommon when evaluating the credibility of all witnesses.  Additionally, Little has failed to cite

39

authority finding the challenged instruction unlawful, and this court has previously concluded that the instruction did not constitute plain error. United States v. Marshall, 307 F.3d 1267, 1270 (10th Cir. 2002) (holding the district court's use of the same language in credibility instruction was not plain error because there was no Supreme Court or Tenth Circuit precedent considering the language, and the Eighth Circuit had approved the language).

### c. The district court's denial of Little's request to recross-examine Watkins does not warrant reversal.

Little argues that the district court erred by denying his counsel's request to recross Watkins after she testified for the first time on redirect that Weatherford was not a drug dealer. One of Little's defense theories at trial was that Weatherford could have been killed by someone related to his drug dealing activities, and therefore, Little argues, it violated his rights under the Confrontation Clause to be denied the opportunity to recross Watkins on that issue.[19]

"When a district court restricts cross-examination at trial, the party seeking to cross-examine forfeits a challenge on appeal by failing to state the ground for objection; stating a different ground at trial than on appeal; or by failing at trial to

---

[19] As an initial matter, it does not appear that Little asserted his theory regarding Weatherford's alleged drug-dealing activities until after Watkins testified. On appeal, Little cites testimony by an investigating officer that Weatherford was a known drug dealer and was warned to "be careful." (I ROA 862). However, that testimony occurred after Little's counsel's request to recross Watkins. Additionally, Little cites his trial counsel's opening statement, but that statement did not include any indication of Little's argument that Weatherford was a drug dealer. (Id. at 761-64).

object to the limitation at all." United States v. Roach, 896 F.3d 1185, 1192 (10th

Cir. 2018) (cleaned up).  Little forfeited his challenge below by failing to offer any

explanation of the grounds for his request to recross Watkins.[20]  While Little did not

argue plain error in his opening brief on appeal, we review for plain error because he

argued under that standard in his reply brief after the government raised the

preservation issue in its brief.  See United States v. Leffler, 942 F.3d 1192, 1198

(10th Cir. 2019) (this court has "left open the door for a criminal defendant to argue

error in an opening brief and then allege plain error in a reply brief after the

Government asserts waiver").

We conclude that even if Little could establish the first three prongs of the

plain error standard, he has failed to establish that any error "seriously affects the

fairness, integrity, or public reputation of judicial proceedings.  Cristerna-Gonzalez,

962 F.3d at 1260 (citation omitted).  A denial of recross-examination on material

matters brought out for the first time on redirect violates the Confrontation Clause of

the Sixth Amendment, which weighs in favor of reversal under plain error review.

See United States v. Riggi, 951 F.2d 1368, 1375 (3d Cir. 1991); United States v.

---

[20] After the government completed its redirect of Watkins, Little's counsel stated, "Your honor, just a few – brief redirect – I'm sorry – recross questions."  (I ROA 597).  The district judge responded, "That's okay.  We'll go ahead," and dismissed Watkins.  (Id.).

We are unpersuaded by Little's argument that the district court cut off his counsel before she could explain the grounds for the recross request, especially given that, before cross-examining a different witness at trial, she requested a side bar and provided the exact explanation that was lacking with respect to the request to recross Watkins.

Hauk, 412 F.3d 1179, 1197 (10th Cir. 2005) (when reviewing for plain error, "if the underlying right is constitutional, we are more likely to conclude that a remand would be appropriate"). However, it is not clear that the district judge had notice of the materiality of Watkins's testimony that Weatherford was not a drug dealer when Little's counsel requested recross—Little's counsel did not explain the basis for her request, and it does not appear that Little had presented his argument that Weatherford was a drug dealer before that time. And there was substantial evidence against Little—including the .300 caliber Remington rifle seized from his home, the bullet found in Weatherford, Little's placement near the scene at the time of the homicide, and the evidence of Little's hostility towards Watkins's past partners. United States v. Turrietta, 696 F.3d 972, 985 (10th Cir. 2012) (concluding error did not affect the integrity of judicial proceedings when the evidence left "no doubt the defendant was guilty of the charged offense"). Therefore, any error by the district court does not warrant reversal under the plain error standard.

### d. None of the government's statements during closing argument warrant reversal.

Little challenges statements made by the prosecutor during closing argument, but he did not object to any of the statements below. When a "defendant fails to object to a prosecutor's statement, reversal is warranted only when: (1) the prosecutor's statement is plainly improper and (2) the defendant demonstrates that the improper statement affected his or her substantial rights." United States v. Fleming, 667 F.3d 1098, 1103 (10th Cir. 2011). "To make the prejudice

42

determination, courts consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." United States v. Christy, 916 F.3d 814, 826 (10th Cir. 2019) (cleaned up). Ultimately, none of the prosecutor's statements below warrant relief.

"Repeated references to prejudicial facts not in evidence." (Aplt. Br. 60). "[P]rosecutorial comments may be improper when they refer to matters not in the evidence or distort the record by misstating the evidence." United States v. Hammers, 942 F.3d 1001, 1014 (10th Cir. 2019).

Little first points to the prosecutor's statement that "all" of the witnesses who spoke with police immediately after the shooting said "[l]ook at Justin Little." (II ROA 51-52). On appeal, the government concedes that this statement "overstated the evidence." (Aplee. Br. 46). That is correct—Chief Brown testified that "three or four" witnesses came to the police station and provided information, but she did not testify that each witness told the police to look at Little. (I ROA 636). Therefore, the statements were plainly improper. However, the statements were not "enough to influence the jury to render a conviction on grounds beyond the admissible evidence presented," as required for reversal. United States v. Orr, 692 F.3d 1079, 1097 (10th Cir. 2012). Chief Brown testified that "multiple people . . . told police about incidents [between Weatherford and Little] that had happened prior to" the murder, and she testified that police spoke to Jana Robinson, who gave information regarding a suspect that was "consistent [with the investigation]." (I ROA 779, 851-52). Additionally, Little had an opportunity to respond to the prosecutor's statements in

43

closing, and the district judge instructed the jury that "[t]he lawyers' statements and arguments are not evidence." (II ROA 30); see United States v. Lopez-Medina, 596 F.3d 716, 740 (10th Cir. 2010) (case involving prosecutor's statement that was not supported by the evidence, explaining that "'a stray improper remark in closing is no basis for upsetting a trial and requiring the parties and district court to redo their ordeal,'" "especially . . . where . . . the jury is advised that arguments of counsel are not evidence" (citation omitted)).

Little next challenges the prosecutor's statement that "every single time [Watkins] tried to have a relationship with anybody after [her relationship with Little ended, Little] found a way to interfere with it in some way." (II ROA 37-38). This statement was not plainly improper, as it was supported by Watkins's testimony. When asked, "[a]fter you broke up with Mr. Little for good in 2015, did you ever again date a man that he did not attempt to interfere with in some way?" Watkins responded, "[n]o." (I ROA 595).[21]

Finally, Little challenges the prosecutor's speculation that Little "[c]ould . . . have had a dark colored jacket." (II ROA 87). That statement was not plainly improper. In her closing argument, Little's counsel highlighted the fact that Little

---

[21] Little also argues that the prosecutor's statement violated the district court's Rule 404(b) order, which limited the government's ability to present prior acts evidence regarding specific incidents involving some of Watkins's ex-boyfriends. We disagree. The Rule 404(b) order did not prohibit Watkins's broad statement about Little's interference with her past relationships, but instead listed a few specific prior acts which could not be presented at trial. Therefore, the prosecutor did not violate the order by referring to Watkins's generalized statement.

was wearing a light shirt when he was arrested and interviewed by police on the day

that Weatherford was killed, and therefore his physical description did not match the

individual seen in surveillance footage following Weatherford—that individual was

wearing dark pants and a dark shirt.  In response, the prosecutor highlighted the fact

that Little was wearing dark pants and "[c]ould . . . have had a dark colored jacket."

(II ROA 87).  "Prosecutors have considerable latitude to respond to an argument

made by opposing counsel."  United States v. Franklin-El, 555 F.3d 1115, 1126 (10th

Cir. 2009) (citation omitted); see also United States v. Dazey, 403 F.3d 1147, 1170

(10th Cir. 2005) ("The prosecutor is entitled to argue to the jury that it should draw

reasonable inferences from the evidence to support the government's theory of the

case.").

"Vouching for the credibility of [a government] witness."  (Aplt. Br. 63).  "An

argument is only improper vouching if the jury could reasonably believe that the

prosecutor is indicating a personal belief in the witness' credibility, either through

explicit personal assurance of the witness' veracity or by implicitly indicating that

information not presented to the jury supports the witness' testimony."  Franklin-El,

555 F.3d at 1125 (cleaned up).

Little challenges the prosecutor's statement that Lackey, one of Watkins's ex-

boyfriends who testified for the government, had "no dog in this fight"—meaning he

had no motivation to lie.  (II ROA 82).  Lackey testified that he believed Little cut

the brake lines to his car in 2017, and the prosecutor referenced this testimony at

closing to support the government's argument that Little showed a pattern of

interfering with Watkins's relationships.  In response, Little's counsel argued that the evidence of the brake-cutting was speculative.  The prosecutor then responded by stating that Lackey had "no dog in this fight" and explaining that "[Lackey] wants no part of any of this.  He wants no part of the Justin Little drama that follows in [Watkins's] wake." (Id.).  The prosecutor's statement accurately characterized testimony by Lackey, who explained that, after the brake-cutting incident, his relationship with Watkins ended and he left the National Guard unit in which he served with Little because he "just did not want to be around any of that."  (I ROA 663).  Therefore, the prosecutor's statement was not improper vouching.

"Improper comments on Little's guilt."  (Aplt. Br. 64).  It is generally improper for a prosecutor to provide his personal opinion about the defendant's guilt. United States v. Meienberg, 263 F.3d 1177, 1179-80 (10th Cir. 2001).

Little argues that the prosecutor made two statements in closing that improperly commented on Little's guilt: when discussing Little's interrogation, during which Little was asked whether a lie detector would reveal that his statements to officers were truthful and Little initially answered affirmatively but then admitted to lying, the prosecutor said that was not "what an innocent person does" (II ROA 43); and when discussing Little's request to see the evidence collected by police before continuing to answer questions in the interrogation, the prosecutor again said, "none of this is what an innocent person does" (II ROA 47).

These statements were plainly improper—the prosecutor stated that an innocent person would not behave the way Little behaved, and this statement had no

46

basis other than the prosecutor's personal opinion.  However, given the strength of the evidence against Little, the opportunity for Little's counsel to respond, and the district court's instruction to the jury that the lawyers' arguments were not evidence, Little has failed to establish that the statements affected the jury's decision, as required for relief.  See Meienberg, 263 F.3d at 1180 (finding prosecutor's comments on the defendant's guilt not prejudicial in part because the district court instructed the jury that the lawyers' arguments were not evidence).

### e. Even when considered cumulatively, any errors by the district court do not warrant reversal.

Little argues that errors by the district court cumulatively warrant reversal. When there are both preserved and unpreserved errors, we first consider whether the preserved errors are cumulatively harmless.  United States v. Caraway, 534 F.3d 1290, 1302 (10th Cir. 2008).  If they are, "the prejudice from the unpreserved error is examined in light of any preserved error that may have occurred."  Id.  Little has identified no preserved errors, and, at most, three unpreserved errors—two statements by the prosecutor that Little displayed conduct that did not match that of an innocent person, and the district court's denial of Little's counsel's request to recross Watkins. Little has failed to carry his burden of establishing that these errors cumulatively affected the jury's decision in his case, as required for relief.

### f. Substantial evidence supported Little's conviction.

Little challenges the sufficiency of the evidence against him.  This court

review[s] the sufficiency of the evidence de novo, considering the evidence in the light most favorable to the government to determine whether any rational jury could have found guilt beyond a reasonable doubt. . . .  In conducting our review, we consider all of the evidence, direct and circumstantial, along with reasonable inferences, but we do not weigh the evidence or consider the relative credibility of witnesses. . . .  Consequently, our review of the evidence is highly deferential[, and] we may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

United States v. Griffith, 928 F.3d 855, 868-89 (10th Cir. 2019) (cleaned up).

Based on the evidence described above, (see supra Part I), we conclude that a rational trier of fact could have found beyond a reasonable doubt that Little committed first-degree murder.

### g. Little's Eighth Amendment challenge to his mandatory life sentence is foreclosed by precedent.

Little challenges his mandatory life sentence under the Eighth Amendment on the ground that "he was 24 at the time of the offense and neuroscience now demonstrates that the adolescent brain develops until age 25 or 26."  (Aplt. Br. 69) (citing Miller v. Alabama, 567 U.S. 460, 471-72, 480 (2012) (holding mandatory life without parole for juveniles violated the Eighth Amendment in part because juveniles' brains are not fully developed and are therefore both less culpable and more capable of reform)).  Little's challenge is foreclosed by this court's precedent. United States v. Williston, 862 F.3d 1023 (10th Cir. 2017) (rejecting eighteen-year-old defendant's argument that Miller should be applied to him, and not just juveniles, and stating, "[i]f the Miller ruling is to be expanded, it is the province of the Supreme Court to do so.").

48

## IV. CONCLUSION

In sum, we hold that the Oklahoma state officers who investigated Little's offense on the Creek Reservation in April 2018 could reasonably believe that they had jurisdiction to investigate and arrest Little. While our 2017 decision in Murphy held that the Creek Reservation had not been disestablished, that decision still does not warrant exclusion here. The state officers who investigated and arrested Little could still reasonably have believed after Murphy that they had jurisdiction to do so based on a combination of multiple unique facts, none of which are independently sufficient—the stay of the mandate in Murphy, suggestions of potential reasons for our stay of the mandate, the potential for Supreme Court review, and the continued understanding in Oklahoma that the state had jurisdiction over offenses on the Creek Reservation.

Finally, none of Little's other arguments warrant relief. Therefore, we AFFIRM Little's conviction and sentence.